[Civ. No. 15021. First Dist., Div. One. Aug. 18, 1952.]

JOSEPH F. DiMARIA et al., Appellants, v. TOM MITCHELL et al., Respondents.

692

DiMaria & DiMaria, in pro. per., for Appellants.

Crist, Stafford & Peters· and Elton F. Martin for Redents.

PETERS, P. J.—Joseph and Philip DiMaria, brothers and partners in the practice of law, brought this action against Tom Mitchell and his wife to recover $6,652 attorneys' fees, it being alleged that as to certain of the services rendered there was an agreed fee, while as to the balance there was no express agreement and the reasonable value of such services is sought. The answer alleges full payment for all services rendered, and further.alleges an accord and satisfaction whereby defendants paid plaintiffs, and they accepted, $1,000 in full satisfaction of all claims. The jury brought in a general verdict in favor of defendants. From the judgment entered on that verdict the plaintiffs appeal.

The DiMarias practice law in Palo Alto. Except for one item of service, Joseph DiMaria rendered the services which are the subject of this action.

The evidence shows that the DiMarias and Mitchell became acquainted in May or June, 1947, and that for a year and several months thereafter certain services were rendered by the DiMarias for Mitchell. The DiMarias claim that all such services were legal services for which they expected to be paid, while Mitchell claims that some of these services were social, for which payment was not expected, or were rendered for other parties involved in such transactions. The DiMarias divided up the work, for which they claim compensation, into eight categories.

1. Mitchell owned a large building in Belmont known as the Belle Monti Country Club. The club property had been sold off and subdivided so that the club building was surrounded by small homes. The area was zoned for residential purposes only. Mitchell was desirous of getting the club rezoned so that he could operate a night club there. Joseph DiMaria attempted to secure this result, and, when unsuccessful, sought successfully to get a rezoning so that the building could be remodeled into an apartment house, and, when that project failed to materialize, discussed with the authorities the possibility of rezoning for an educational use, and finally secured a rezoning so that the building could be sold to and used by a research foundation. Joseph testified also to services in exchanging the club property for certain property in San Jose owned by the foundation, and leased to a Safeway store. Joseph testified that he made six to eight appearances before the planning commission and city council of Belmont, that he spent many hours discussing the problems with Mitchell, and that he spent at least 300 hours in research, in connection with the problems involved. Joseph also testified that he had an express agreement with Mitchell in reference to these services, Mitchell agreeing to pay, and he to accept, $2,250 for these services. Joseph admitted that while these services were being rendered Mitchell paid him $500, which he credited on the club account. Admittedly the foundation, the other party to the exchange of the properties, paid Joseph $220 for his services to them on that deal.

Mitchell testified that he never formally hired the DiMarias; that he knew Joseph socially and saw him frequently; that DiMaria simply took it upon himself to help out as a social courtesy. The experts called by each side differed widely as to the reasonable value of these services. Plaintiffs and their expert fixed the reasonable value at $2,250 to $2,500, while defendants' experts fixed the value at $750 to $1,000.

2. The second item of service was rendered by Philip DiMaria who handles tax matters for the firm. He testified that he was hired by Mitchell to represent him in attempting to secure a reduction of a claimed income tax deficiency. He further testified that he saved Mitchell $404.70, and that his agreement with Mitchell was for a minimum fee of $25 plus one-half of any saving. Thus, he claimed an agreed fee of $202.35 for these services, which include a treasury department hearing and several conferences. Mitchell admitted hiring the firm for this service, denied the express agreement for a contingent fee, and denied ever receiving a bill for this service.

3. The plaintiffs claim $250 as the reasonable value of services rendered by them in connection with the Safeway store property received by Mitchell in exchange for the club property. Joseph claims that he helped to negotiate a loan on this property, but this was denied not only by Mitchell, but also by the president of the bank who made the loan, he testifying that DiMaria had nothing to do with the loan. Joseph also testified as to certain services in connection with the insurance on the property, and with the further renting and possible sale of the property. He estimated the total time spent on this item as 25 or 30 hours. Mitchell denied ever hiring plaintiffs to perform any service in connection with this property. One of the experts for defendants fixed $100 as the reasonable value of these servces, while the other opined that the services were worth $250. Plaintiffs' expert testified that the services were worth from $200 to $400.

4. Plaintiffs next claim $1,000 as the reasonable value of services rendered in connection with the El Mar Bar, sold by Mitchell to Palmer and Rossi. The purchasers had defaulted and finally Joseph helped to work out a compromise whereby Mitchell surrendered $500 of his claim and was paid $5,000 in cash, after the purchasers refinanced their loan. DiMaria testified as to the negotiations had by him, the documents he prepared and the filing of two lawsuits, all of which took between 15 and 20 hours of time. He also testified that, although there was no express contract for a fee, he treated this transaction as being on a contingent basis, and believed that since he had recovered $5,000, $1,000 would be a fair fee. After Mitchell received the $5,000 he paid Joseph $500, which Joseph credited to this account. The experts for defendants fixed the reasonable value of the services here rend-

ered as $120 and $250, while plaintiffs' expert fixed it at $1,250.

5. Plaintiffs next claim $750 as the reasonable value of services rendered Mitchell in connection with the Club Casino. Mitchell had sold this business to the Christianas and took back a promissory note for $28,000, payable in monthly installments at the rate of $1,000 a month, and secured by a chattel mortgage on the fixtures. The Christianas defaulted and DiMaria ultimately collected $1,000 from them before they ended up in the board of trade. Joseph testified as to the difficult legal research performed by him in this matter, and as to three trips to San Francisco required in connection with the negotiations. Plaintiffs' expert fixed the reasonable value of these services at $600, while one of defendants' experts fixed it at $100, and the other at $230.

6. The DiMarias claim $250 for services rendered in securing a default judgment against the Christianas. Admittedly they brought suit against the Christianas on two open accounts, one for $301 and one for $500, and on a promissory note for $350. A default judgment in those amounts was secured, together with an allowance of attorneys' fees in the amount of $50. Mitchell challenges the validity of the judgment on the ground that it was signed only by the court clerk, contending that a judgment including attorneys' fees must be signed by the judge. A judicial sale was held of some of the fixtures involved, and Mitchell bid in the property at such sale. The Christianas ultimately were thrown into bankruptcy. Joseph testified that he spent six to eight hours on this problem, that there was no agreement as to the amount of fee for this service, but that he treated it as a contingent matter and believed a $250 fee to be reasonable. Defendants' experts fixed the reasonable value at $250 and $100 respectively.

7. Joseph also filed suit and secured an ex parte restraining order against the Christianas preventing them from removing and disposing of certain fixtures. Two hearings on a motion to dissolve this order were had, whereupon all concerned stipulated that it should remain in force until the further order of the court. Joseph testified that he spent 10 or 11 hours on this transaction, that there was no agreement as to the fee, and that the services were reasonably worth $200 or $250. The two experts for defendants opined that the services were worth $100 and $150 respectively.

8. The last item involved relates to a 3-acre piece of unimproved property owned by Mitchell and located near an

establishment referred to as Dinah's Shack. Joseph testified to securing permission from the proper officials to subdivide this property, of helping refinance it, and various incidental services. He devoted 10 to 15 hours to this problem, admitted that there was no agreement for a fee, and believed $250 to be a reasonable fee. Defendants' experts fixed the reasonable value at $100 and $50 respectively. Mitchell denied any hiring at all as to this item, claiming that Joseph was desirous of including in Mitchell's subdivision some nearby property owned by Joseph. This was denied by Joseph.

As to several of the transactions involving the prospective sales of some of the properties, Mitchell testified that Joseph was acting as attorney for the real estate broker involved, who was a client of the DiMarias, and was not acting as attorney for Mitchell.

In addition to the defense that the DiMarias had been paid in full for all services renderd, Mitchell pleaded and attempted to prove, an accord and satisfaction. He first testified as to the payment of the first $500, and then testified to meeting Joseph at a restaurant in August of 1948. Mitchell testified that at that time he handed Joseph $500 and ''told him the case was closed and that was the end of that. . . . I just told him that I sold everything, I didn't need him any more and I was closing the bill. He accepted it. Q. And he accepted that $500? A. That's right, the full payment.'' Joseph admitted meeting Mitchell at the restaurant on the day in question, but denied then receiving or accepting the $500, testifying that Mitchell left a $500 check for him at the restaurant and that he called for it and cashed it several days later. He testified that there was no agreement to accept it in full payment.

This testimony as to an accord and satisfaction is important because the evidence shows that Mitchell paid the DiMarias $1,000, that they also received $220 from the research foundation, and that even defendants' experts admitted that the services as testified to by plaintiffs were reasonably worth more than the amounts already received by the DiMarias. Thus, inasmuch as the jury brought in a verdict for defendants and so awarded plaintiffs nothing, it is reasonable to assume that the jury may have determined that there was an accord and satisfaction.

 Plaintiffs first urge that the trial court committed error in refusing to allow them to prove that if an accord

and satisfaction had been entered into, they had, in fact, rescinded it. With this contention we agree.

The evidence shows that under date of October 17, 1948, the DiMarias sent, and the Mitchells received, a demand for payment, which was properly admitted into evidence. As part of the same document the DiMarias included a notice of rescission reading as follows: "To Tom Mitchell and Mary Mitchell: You and each of you are hereby notified that Joseph F. DiMaria and Philip A. DiMaria, attorneys at law, as co-partners practicing law under the firm name and style of DiMaria and DiMaria, hereby rescind any/or all agreements for settlement of or compromise of attorneys' fees owing by you or either of you to said firm."

The trial court refused to admit this portion of the document, holding that the document was admissible only for the limited purpose of showing a demand for payment. The exact theory upon which the notice of rescission was excluded is not clear. The court first commented on the fact that rescission was not pleaded by the plaintiffs. But since the accord was first pleaded in defendants' answer, and since allegations in the answer are deemed denied, and since there is no requirement for a replication in this state, it does not appear how the fact that plaintiffs did not plead a rescission is relevant on the issue of admissibility. Then the court stated that the rescission was inadmissible "on the theory of competence." Later in the trial when plaintiffs attempted to elaborate on the reasons why the notice was sent, the trial court pointed out that Joseph had testified that no accord had been entered into and seemed to believe that this precluded evidence of a rescission of the accord. In final justification of its position the trial court expressed the thought that in some unexplained way the attempted rescission was part of an inadmissible offer of compromise. Interestingly enough, this evidence was first excluded before there was any evidence as to whether or not an accord and satisfaction had or had not been entered into.

It is quite clear that plaintiffs were entitled to show that any accord that may have been entered into had, in fact, been rescinded. The fact that plaintiffs denied the existence of the accord did not prevent them from defending on the ground that if an accord existed it had been rescinded. The accord had been pleaded by defendants as an affirmative defense. The law permits the parties to assume inconsistent positions. Plaintiffs were legally entitled to offer evidence

that no contract of accord and satisfaction had been entered into, but, if it had, then such agreement had been rescinded.

Defendants seek to uphold the rulings complained of on the ground that plaintiffs made no offer of proof, contending that such offer was indispensable, citing *Deeble* v. *Stearns,* 82 Cal.App.2d 296 [186 P.2d 173]. That case undoubtedly held that one asking a question which is excluded must, by an offer of proof, show that the answer to the question would have been favorable before its exclusion will be held to constitute error. ■ But it is equally well settled that no offer of proof is required when an entire class of evidence is excluded where the relevancy of such class of evidence is apparent. (*Caminetti* v. *Pacific Mut. Life Ins. Co.,* 23 Cal.2d 94 [142 P.2d 741] ; *Heimann* v. *City of Los Angeles,* 30 Cal.2d 746 [185 P.2d 597].) In the instant case it is quite clear from the repeated comments of the trial court that no evidence of a rescission would have been permitted.. We do not mean to hold that the notice here involved would, in law, constitute a rescission. But we do hold that the trial court committed serious error in excluding the document from evidence, and necessarily excluding all other evidence of a rescission.

This error was aggravated by the fact that after Joseph had testified that he had never entered into an accord and satisfaction, defendants were permitted to use the notice of rescission, which, of course, presupposes the existence of a valid accord, as an admission against interest, and plaintiffs were precluded from explaining why the notice was sent. It seemed to be the theory of the trial court that, while the notice of rescission amounted to an admission that a valid accord had been entered into, the plaintiffs, because they denied entering into the accord, could not explain the apparent admission. ■ Of course a party against whom an admission operates may explain it if he can. (Code Civ. Proc., § 2052; see cases collected 10 Cal.Jur. p. 1057, § 307.)

■ ■ Appellants also properly claim error in the giving of the following instruction: ''If from the evidence presented in this case, you find that an agreement relating to fees was reached between the plaintiffs and the defendants after the relationship of attorney and client already existed between them, and you further find that there were special relations of confidence existing in that relationship; or that plaintiffs failed to fully disclose to defendants the extent of the services already performed and those to be required under said agreement, then you are instructed that regardless of the terms

of said agreement, the utmost limit of recovery to which plaintiffs are entitled is the reasonable value of the services actually rendered.''

Thus, under this instruction, if any agreements for a fixed fee were entered into after the relationship of attorney and client came into existence and under the circumstances set forth in the instruction, then, as a matter of law, plaintiffs were limited to a recovery of the reasonable value for such services regardless of whether the evidence showed that the agreed fees were reasonable, and without a showing of undue advantage gained. Respondents cite cases like *Magee* v. *Brenneman*, 188 Cal. 562 [206 P. 37], and *Lady* v. *Worthingham*, 57 Cal.App.2d 557 [135 P.2d 205], as supporting the instruction. Those cases state the proper rule to be that when a contract for a fixed fee is made after the relationship of attorney and client has come into existence, a rebuttable presumption of undue influence and insufficiency of consideration arises. The challenged instruction makes the presumption conclusive.

That the giving of this erroneous instruction was prejudicial is apparent. Plaintiffs testified as to an agreed fee of $2,250 for their work on the country club property, and of $202.35 on the income tax matter. By the instruction these contracts (if found to exist by the jury) were thrown out of the case no matter how reasonable they may have been when entered into.

Plaintiffs urge that various other errors were committed. They need not be discussed in this opinion. The errors discussed require a reversal.

The judgment appealed from is reversed.

Bray, J., and Wood (Fred B.), J., concurred.