[Civ. No. 19215.   First Dist., Div. One.   Oct. 31, 1960.]

JOHN GALLOIS, Appellant, v. WEST END CHEMICAL COMPANY (a Corporation), Respondent.

Nichols, William, Morgan & Digardi, Kenny & Morris, Kenny, Morris & Ibanez, George Olshausen, Hyman & Hyman and Robert W. Kenny for Appellant.

Bronson, Bronson & McKinnon, Vincent H. O'Donnell and Fredrik S. Waiss for Respondent.

DUNIWAY, J.—Appeal by a dissenting shareholder of respondent West End Chemical Company, a California corporation, from a judgment determining the fair market value of his shares, pursuant to the provisions of Corporations Code, sections 4300-4318.

The sole question before us is whether the court below was in error in excluding evidence offered to show that appellant's stock, which was a participating preferred stock, callable at $1.05, was "de facto" noncallable. We conclude that the judgment was correct.

Appellant asserts that a federal question lurks in this record, the theory apparently being that due process requires that the dissenting shareholder not only be paid the fair market value of his shares, but that fair market value be ascertained as appellant would have it ascertained. We think, however, that there is nothing in this point. The State of California has long reserved the right to alter the existing rights and duties of shareholders. (Const., art. XII, § 1; Corp. Code, § 126; *Market Street Ry. Co.* v. *Hellman,* 109 Cal. 571, 584-585 [42 P. 225]; Ballantine & Sterling, California Corporation Laws, pp. 6-9, 432.)

Ballantine and Sterling say at page 432: "It can hardly be seriously contended, under the California law, that a provision for compensation is a necessary condition to the constitutionality of statutes providing for merger . . . and other corporate changes. The open question is primarily one of policy . . . ." We think that the sole question before us is one of statutory construction, not one of constitutional power.

THE FACTS

Effective October 1, 1956, West End Chemical Company was merged into Stauffer Chemical Company, following the favorable vote of the shareholders of both companies on September 24. Appellant holds 58,712 shares of participating

preferred stock of West End, out of 1,609,341 shares outstanding, all of which had been outstanding for about 30 years. This stock has at all times been subject to call at 105 per cent of par value ($1.00), but none of it has ever been called. It has full priority over the common shares in liquidation and cumulative dividend priority to the extent of 6 per cent of its par value, and in addition, after the payment of dividends on the common equal to 6 per cent of the latter's par value, is entitled to equal dividends with the common.

Appellant did not vote for the merger and took all necessary steps required by Corporations Code, sections 4300-4318, to recover the fair market value of the shares. The court found that the fair market value on the date of the merger, excluding any appreciation or depreciation in consequence of the proposed merger, was $1.30 per share, and judgment was entered accordingly.

At the date of the merger a group of 11 persons, referred to as the Smith-Ellis group, collectively owned 56.6 per cent of the common stock and 29.7 per cent of the preferred stock of West End. Stauffer owned approximately 16 per cent of the common stock and 37 per cent of the preferred stock of West End. Representatives of these stockholders controlled the board of directors.

### PRETRIAL AND TRIAL

On the basis of an agreed statement showing the foregoing and some additional facts, the parties submitted to the pretrial judge two questions of law: (a) what is the meaning of fair market value as that phrase is used in sections 4300-4318 of the Corporations Code; and (b) what elements are to be taken into consideration in establishing fair market value?

The pretrial judge made an order under which the trial court was to inquire into purchases and sales of West End preferred during the period up to and including September 24, 1956 (the date when the stockholders of the companies voted upon the merger) and to determine therefrom whether there existed during such a period a "market."[1]

---

[1] The court directed the inquiry should include, but not be confined to, a consideration of the following: "(1) Were the buy and sell prices for West End Chemical stock in any way controlled, manipulated or 'rigged'? (2) Was such a stock so seldom traded and in such small lots that a true market did not exist? (3) Were the buy and sell prices for such stock affected by any sudden or temporary situation which, in the long run would not change its market value? (4) Did a situation exist in which there was a little or no likelihood that the directors of West End Chemical would elect to call the preferred stock for such reasons as tax

It was further ordered that if the court should determine that a market did exist on the date in question, then it shall determine the market price as of that date, excluding therefrom any appreciation or depreciation in consequence of the proposed merger. There was a further provision for an alternative method of determining the fair market value if the court should find that a "market" for the stock did not exist.

Thereafter the respondent requested that the court correct the pretrial order by striking out items numbers (4) and (5). This request was denied by a second pretrial order.[2]

The case went to trial under these two pretrial orders. At the trial it was shown, and the court found, that a formal announcement of the terms of the proposed merger was made by the officials of West End on August 27, 1956, and that newspaper publicity was given out on or about June 20, 1956. It was also shown that there was an extensive and active over-the-counter market for the stock, and had been for many years. In order to comply with the last sentence of section 4300 of the Corporations Code, which provides that the fair market value shall be determined as of the day before the vote of the shareholders approving the agreement of merger, "excluding any appreciation or depreciation in consequence of the proposed action," the court chose the over-the-counter market prices during the period January through May 1956, and on

consequences, depletion of working capital or any other reason? (5) If such a situation did exist, was this a pertinent fact, the knowledge of which was in possession of buyers and sellers in the market? (6) Was public knowledge of the ratios at which West End preferred and common shares were to be exchanged for Stauffer common reflected in the buy and sell prices of these two classes of stock as of the day before the vote of the shareholders approving the agreement of merger or consolidation? (7) If so, did such prices as of said day exclude any appreciation or depreciation in consequence of the proposed merger?"

[2] The second order recites that the market contemplated by the code sections is one created by informed buyers and informed sellers. The order also states: "In the instant case, it cannot be said that informed buyers and sellers (usually acting through brokers) would not have knowledge of the call price and consider it as a factor in determining the market price of the stock in question. Hence, in determining whether there were sufficient informed buyers and sellers to create such a 'market,' an inquiry as to what consideration was given to the call price provision would be pertinent.

"However, the question, at this point in the proceedings, would be whether such consideration had been given and not whether, in fact, the company might or might not have called the stock. If such consideration was given, the question as to whether the conclusion reached was right or wrong would be irrelevant and immaterial.

"It is apparent that paragraph 4, page 2, lines 8-10, of the Pre-Trial Conference Order, is not well worded but, with what is said herein, it is not believed that the trial court will be misled."

the basis of those prices fixed the fair market value at $1.30 per share. The court found that from January 1, 1954, to September 24, 1956, there was a market for the preferred and that it was one of buyers and sellers who were informed as to all matters necessary to constitute them informed buyers and sellers and the market an informed market. It also found that there is no evidence on whether the market was or was not informed as to whether or not any decision had been made to call or not to call the preferred stock.

The trial consisted of a showing of the nature and extent of the market, by West End, and, on the part of appellant, of efforts to show that an informal determination had been made by the directors of West End not to call the stock for the reason that to do so might cost the stockholders of the Smith-Ellis group a large amount of money in income taxes, and that the fact that this determination had been made was not known to traders in the over-the-counter market, so that the market was not composed of ''informed'' buyers and sellers.

Appellant showed through the testimony of an expert that the market value of a preferred stock that is subject to call is largely controlled by the call price, and that if the stock were not callable, and if it were a participating preferred stock such as that owned by appellant, the price of the stock would move along with the price of common.

When the plaintiff offered evidence designed to show that an informal decision had been made not to call the stock, the evidence was excluded by the trial judge apparently partly on the theory that he was required by the second pretrial order to exclude it, and partly on the theory that it was not admissible in any event.

Appellant made no effort to show, and frankly stated at oral argument that he could not show, that the directors of West End had ever at any time taken official action which would make the stock noncallable. Legally, of course, this would require an amendment of the Articles of Incorporation and no such amendment was ever adopted. Appellant contends that if there was an informal oral understanding among the directors that they would never call the stock, then the stock was ''de facto'' noncallable, and further contends that if such fact were known to over-the-counter traders the price would have approached the price of common instead of being, as it was, far less than the price of common in more recent years.

It seems obvious that traders in the market did in fact take into account the long period, over 30 years, during which the

stock was never called, and were willing to pay prices which must have been based in part upon a gamble that the stock would not be called. The market price as found by the court was about $1.30 per share which is almost 25 per cent higher than the call price.

The evidence offered by the appellant consisted almost entirely of memoranda prepared by various counsel, addressed to Stauffer, not West End, and prepared at a time when the proposed merger was under consideration and in connection with such consideration. According to the respondent's answer to appellant's interrogatories, the only advice ever received by respondent as to the tax consequences to the holders of the participating preferred, if it were to be called, was received in connection with the consideration of the proposed merger. The memoranda of counsel are all dated May, June and August of 1955. One other item of evidence was a letter from a shareholder (not of record) to the president of West End, dated May 21, 1956, in which the alleged shareholder suggested that the preferred should be called. This also was at the time when the directors had begun the consideration of a merger with Stauffer, that consideration having started as early as May 1955.

Counsel for appellant sought to examine the president of West End under Code of Civil Procedure, section 2055, concerning these documents, for the avowed purpose of showing that the directors of West End, presumably because of the questions raised by tax counsel as to the consequences of a call, had determined informally not to call the stock. Counsel frankly stated at oral argument that they had no knowledge as to whether such an examination would prove such an understanding or not. No effort was made at any time to show that such an understanding existed *before* the directors began to consider the possibility of a merger with Stauffer. Counsel also conceded that there was no active misrepresentation but only a failure to disclose the informal decision that he sought to prove.

In fixing the fair market value the court eliminated the distortions that occur in price fluctuations from day to day by averaging the price per share on monthly sales in the months of January through May 1956.

### THE APPLICABLE LAW

Respondents contend that even though it were held that an informal decision not to call the stock should have been known to traders in order to make the market a fair one, the

evidence presented by appellant was properly excluded because it did not tend to show any such decision. With this position we cannot agree, for the reason that the court indicated that it would exclude all evidence directed to such a showing. Under these circumstances, the insufficiency of the evidence actually offered is not a ground for the affirmance of the judgment. ■ Our courts have repeatedly held that where an entire class of evidence is excluded and the right of cross-examination upon the subject has been prevented, no offer of proof is necessary. (*Di Maria* v. *Mitchell*, 112 Cal.App. 2d 691, 698 [247 P.2d 60] ; *Van Horn* v. *Southern Pac. Co.*, 141 Cal.App.2d 528, 536 [297 P.2d 479]. See also *Lawless* v. *Calaway*, 24 Cal.2d 81, 90-91 [147 P.2d 604] ; *Tossman* v. *Newman*, 37 Cal.2d 522, 525-526 [233 P.2d 1].)

Sections 4300 and following of Corporations Code are a recodification of the provisions of former Civil Code, section 369, which was added in 1931 (Stats. 1931, pp. 1817-1819). The statute then provided substantially the same procedure as is now set forth in the Corporations Code. However, it provided that the dissenting shareholder was to receive the "fair cash value" of his shares. Moreover, it provided: "The court shall appoint three impartial appraisers to value the shares." (Stats. 1931, p. 1818.) Thus, the statute, as originally enacted, contemplated an appraisal of the shares in every case, and it used a different definition of value from that now appearing in the Corporations Code.

There were two principal reasons for the enactment of Civil Code, section 369. One was to permit mergers over the objection of a defined minority of shareholders (Corp. Code, § 4123). Under the prior law, a dissenting shareholder could block a merger. The other was to provide the objecting shareholder with a means of getting compensation for his stock.

The 1931 statute was apparently considered unsatisfactory, as it was amended in 1933 (Stats. 1933, pp. 1399-1402). In general, the same procedure was prescribed, but the amendment made two important changes: first, it provided that the dissenting shareholder was to receive the "fair market value" of his shares; second, it provided that on the trial of the action "the court shall determine or shall appoint three impartial appraisers to determine, the fair market value of said shares" (Stats. 1933, p. 1401). Thus the court was given the option to appoint appraisers, which it would presumably do in a case where there was no market for the stock, as in *Estate of Rowell*, 132 Cal.App.2d 421 [282 P.2d 163], but it could

save the parties the unnecessary burden and expense of an appraisal where there was an established market, as we think there was in this case.

As appellant points out in his opening brief, Professor Ballantine was one of the draftsmen of Civil Code, section 369, as adopted in 1931 (see 3 State Bar J. No. 6; 19 Cal. L. Rev. 465, 482). In his book, Ballantine and Sterling, California Corporation Laws, 1949 edition, at page 434, he says: "It is believed that market value affords a more objective standard and one more readily ascertainable than fair cash value, and that evidence of average market quotations, sales, earnings, book values, and prospects would be admissible. [Evidence as to all these matters was admitted in this case.] Thus under this standard, in the case of the larger corporations at least, there will be no need of the herculean task of an appraisal of all the assets of the corporation, as the shares will have a fairly well-established market value. The use of the word 'fair,' however, indicates that market quotations for the particular day would not be conclusive."

It seems clear, then, that one purpose of the 1933 amendment was to eliminate the necessity of appraisal when an actively traded stock, for which there can fairly be said to be a market, is involved. At the same time, the dissenting stockholder was not to be paid a price that reflected a distortion of the value of his stock by reason of the proposed merger.

■ We think that the evidence was properly excluded for two reasons:

First: If we assume that by reason of the questions raised by tax counsel, the directors of West End, in May 1955, or thereafter, decided not to call the preferred stock, and if we further assume that that fact should have been known to over-the-counter traders in order to make the market an informed market, then it follows that the other information then available to the directors should also have been available to traders, namely, that a merger with Stauffer was under contemplation. Under those circumstances, the market would immediately have been influenced by the possible consequences of the proposed merger and those consequences would have to have been excluded by the court in determining the fair market value, under the provisions of Corporations Code, section 4300.

Second: To permit a shareholder to attack the fairness of a market, long established, active, and based upon standard financial information and reports, including the legal status

of the stock as being subject to call, a market not distorted by fraud, manipulation, rigging, or unfair conduct of the management vis-à-vis the shareholders, by showing an informal decision of the directors not to call the stock, which decision of course is revocable at any time and not binding on anyone, would, we think, defeat the very objectives which the Legislature had in mind when it amended the law in 1933. There are all sorts of possible actions by directors of corporations whose stock is traded in the market and which, if known, might affect its market value. For example, the directors of a corporation may be considering a substantial extra dividend. This information is normally kept confidential until formal action to declare such a dividend is taken, at which point the public announcement is immediately made. There is usually at that point a marked effect upon the market price, yet we think that no one could successfully argue that the market price of the stock before the dividend action was taken was not a fair market price.

One important element of the market for listed stocks and for stocks traded over the counter is the informed guesses by traders as to what the action of the board of directors may be. Many traders are sophisticated people whose business it is to make daily appraisals of securities for the purpose of buying and selling both for their own account and for the account of their customers. The evidence shows many purchases and sales of this stock by such traders. The minute that some traders get inside information before action is taken, the market can be said to be "rigged." It was this type of market which was excluded from consideration by the pretrial order. We think that exclusion was proper. On the other hand, the evidence clearly shows that there was an active and informed market for the stock and we think the court properly determined its fair market value from the prices quoted and paid on that market.

We are aware that there exists a considerable literature in the law reviews and elsewhere on the subject of the valuation of the shares of dissenting minorities in mergers and consolidations,[3] as well as considerable case law in other states.[4] There seems to be no state having a statute that uses the same definition of value with similar legislative history, as our

[3] *Cf.* 19 Minn. L. Rev. 473; 15 Cornell L. Q. 420; 17 *ibid.* 485; 45 Harv. L. Rev. 233; 32 Columb. L. Rev. 60; 40 Cal. L. Rev. 140-141; 2 Bonbright, Valuation of Property, ch. XXIV, pp. 811-812, 823-826.

[4] Notes, 87 A.L.R. 597; 162 A.L.R. 1237; 174 A.L.R. 960.

774

statute. Thus decisions in other jurisdictions are not directly in point. Many writers prefer some other definition, such as our former "fair cash value," or as "intrinsic value," or "real value" or "fair value," etc. We do not know what those terms or others like them mean, and we suspect that the writers who advocate them do not know either. They use them because they distrust the market as a gauge of value. Yet realistically, under our economic system, the value of any item of property on any given date, in monetary terms, is what it can be sold for in a free and fair market. This has long been the rule in this state in cases of condemnation of real property, a process at least as involuntary as that now before the court. (*Sacramento etc. R.R. Co.* v. *Heilbron* (1909), 156 Cal. 408 [104 P. 979].) In such cases, the owner has no choice but to sell; in our case he had a choice of participating in the merger or receiving the fair market value of his shares.

There is considerable precedent for valuation of stock by its fair market value. Thus for federal tax purposes, as well as California tax purposes, this is and has long been the standard. (*Cf.* Fed. Int. Rev. Serv. Reg., § 20.2031-2 [estate tax], § 1.1014-3 [income tax]: 18 Cal. Admin. Code, § 13951 [inheritance tax], § 17743, subd. (3) [income tax].) Under the regulations, if there is a market on a stock exchange or over-the-counter, the market price normally controls. It is only where there is not a fair market, or where there is no market, that appraisal is resorted to, and even then, the endeavor is to find what the market price would have been had there been a sufficient and fair market. (*Cf.* Fed. Int. Rev. Serv. Reg., § 20.2031-2 (e) and (f).)

The administration of justice in the courts, like the administration of the tax laws, is an intensely practical matter, and the making of elaborate appraisals, to arrive at some theoretical and undefinable concept of value, can be a costly, time-consuming and frustrating business, as witness the experience of the tax court and federal courts in trying to value shares of closely held corporations, for which there is no market. (C. C. H. Fed. Est. & Gift Tax Rep., par. 1202 at par. 1202.10, and cases there cited.) As Ballantine and Sterling say, *supra*, we think that our statute was amended in 1933 partly for the purpose of avoiding just such performances, wherever there is in fact a fair market. The problem is bad enough where there is no market, as in *Estate of Rowell, supra.* We do not think that appellant's proffered evidence goes to the question of whether the market for his

stock was a fair market, or the value that it reflected was a fair market value. Market prices in a market such as was shown to exist in this case, are in fact what willing buyers have paid and willing sellers have accepted, and no appraiser or expert can make a better determination of fair market value than that.

Our statute seems to have worked well, as this is the first case to come before an appellate court since it was enacted nearly 30 years ago. If there were evidence that management had controlled, rigged or manipulated the market, either directly or by conduct unfair to the shareholders and tending to affect the market price, the case might well be different, but such a case is not before us.

Since it is our opinion that the decision of the court was correct, it is unnecessary for us to pass upon the question as to the precise meaning of the pretrial orders or the extent to which they were binding on the court, either at the trial or upon motion for new trial.

Affirmed.

Bray, P. J., and Tobriner, J., concurred.

A petition for a rehearing was denied November 25, 1960, and appellant's petition for a hearing by the Supreme Court was denied December 21, 1960.