Filed 1/8/14

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| LAVERNE BUSSE et al., | |
| Plaintiffs and Appellants, | G046805 |
| v. | (Super. Ct. No. 30-2011-00439984) |
| UNITED PANAM FINANCIAL CORP. et al., | O P I N I O N |
| Defendants and Respondents. | |

Appeal from a judgment of the Superior Court of Orange County, Kim Garlin Dunning, Judge. Affirmed in part and reversed in part.

Faruqi & Faruqi, David E. Bower and Barbara Rohr for Plaintiff and Appellant Laverne Busse.

Robbins Geller Rudman & Dowd, Randall J. Baron, Kevin K. Green and David T. Wissbroecker for Plaintiff and Appellant Sydne & Allan Bortel Living Trust U/A/D 9/14/1998.

Jones Day, Eric Landau, Erica L. Reilley, Travis Biffar and Kevin H. Logan for Defendants and Respondents United Panam Financial Corp., Ravi Gandhi, Mitchell Lynn, Luis Maizel, Preston Miller and James Vagim.

## I.  INTRODUCTION

Occasionally we are faced with a difficult question of statutory interpretation that qualifies as a "Halbert's Lumber issue."  (E.g. *Halbert's Lumber, Inc. v. Lucky Stores, Inc.* (1992) 6 Cal.App.4th 1233, 1235 ["a real doozy of a puzzle"].)  This is such a case, involving section 1312 of the Corporations Code, which generally governs the rights of minority shareholders who dissent from mergers and buyouts.[1]  No published case has confronted the problem of how subdivision (b) of section 1312 – which involves buyouts when parties to a merger are under common control – interacts with subdivision (a) of section 1312, which – we know because the Supreme Court said so in *Steinberg v. Amplica, Inc.* (1986) 42 Cal.3d 1198 – limits the rights of dissenting minority shareholders to an independent appraisal of the value of their shares.[2]

Here, the trial judge was faced with two radically different views of section 1312, subdivision (b):  Plaintiffs, former minority shareholders in United Panam Financial Corporation, assert subdivision (b) should be read as a broad exception to *Steinberg's* interpretation of subdivision (a).  Under their thinking, in cases of common

---

[1]    All further undesignated statutory references are to the Corporations Code.   All further references to any subdivision are to section 1312.

[2]    Technically, the idea that section 1312, subdivision (a) limits dissenting shareholders to an appraisal is shorthand.  Reminiscent of some federal Supreme Court litigation 13 years ago, the statute also allows attacks on the process of the *vote* for reorganization, i.e., were enough "legal votes" cast in its favor?  That part of the statute, however, has not generated any published litigation, so saying "limited to appraisal" adequately conveys the flavor of the statute.

control, subdivision (b) allows dissenting minority shareholders all common law rights, including the right to sue the majority owners and collaborating board members for damages arising out of breach of fiduciary duty. (Cf. *Jones v. H. F. Ahmanson & Co.* (1969) 1 Cal.3d 93, 108 [general fiduciary duty of majority shareholders not to "use their power to control corporate activities to benefit themselves alone or in a manner detrimental to the minority"].) Defendants, on the other hand, largely centered around the company's alleged controlling shareholder, Guillermo Bron, proffer a more modest view of the subdivision (b) exception: In addition to the appraisal rights which all shareholders have in all situations, in common control situations dissenting minority shareholders have the additional right, if they timely choose to use it, of having a merger itself set aside or rescinded. But they still do not have any right to sue *for damages* for breach of fiduciary duty.

The trial judge chose the more modest reading of subdivision (b), and, accordingly, sustained the defendants' demurrer to the minority's suit for "rescissionary damages" based on breach of fiduciary duty. She was correct to do so and we affirm that part of the judgment. We are convinced that when section 1312 is read in light of its history and its judicial construction, no other result is tenable.

However, since the minority shareholders have never withdrawn their alternative request to set aside the merger, we cannot affirm the judgment entirely. The minority shareholders did sufficiently allege common control of the corporation, and subdivision (b) does, plainly, allow for suits to set aside or rescind mergers in common control situations. Therefore, we must reverse and remand for resolution of that question.

## II. FACTS

A. *Standard of Review*

This case comes to us after a demurrer to the minority's second amended complaint was sustained without leave to amend.[3] Thus the minority receives the benefit of having its version of the facts accepted. What should be stressed here, however, is that the minority's second amended complaint also receives the benefit of reasonable *inferences* drawn from the facts alleged. (E.g., *Kruss v. Booth* (2010) 185 Cal.App.4th 699, 727 [rejecting corporate directors' arguments that alleged self-dealing was otherwise justified because defenses, which might be "valid" in "other procedural contexts," were unavailing on demurrer].)

The standard of review is particularly important in this case because the second amended complaint alleges that defendant Guillermo Bron has always controlled about 40 percent of Panam Financial's stock throughout its history, and "no director whom Bron has supported for election has ever failed to receive the requisite number of votes for election or reelection." The pleading also alleges that in public filings in 2007 and 2008, the company actually admitted Bron would "have substantial influence" over the "management and affairs" of the company, "including the ability to control substantially all matters submitted to our shareholders for approval."

Against these allegations is set the text of section 1312, subdivision (b) itself. The statute is clear that allegations of common control can be founded on even *indirect* control. It opens with the language: "If one of the parties to a reorganization or short-form merger is directly *or indirectly* controlled by, or under common control with,

---

[3] Two sets of minority shareholders have appeared in this appeal: The Sydne & Allan Bortel Living Trust U/A/D 9/14/1998 and LaVerne Busse, an individual. We refer to them as "the minority," or sometimes as "the minority shareholders," and when the need to refer to them separately arises, as either "the Bortels" or "Busse." We refer to the defendants as "Bron" or, in some cases, "the Bron group." We refer to the corporation as "Panam Financial" or sometimes as "the company" or "the corporation."

another party . . . ." (Italics added.) So, if the second amended complaint states facts that give rise to an inference of even indirect control, that is sufficient to defeat a demurrer.

While no case law has yet interpreted subdivision (b)'s indirect common control language, we do have the holding in *Hellum v. Breyer* (2011) 194 Cal.App.4th 1300 to help us. There, three "outside" – meaning nonemployee – directors of a five-director company were sued under a Corporations Code statute (§ 25504) which provides for the liability of everyone who "directly or indirectly controls" an entity that sells unqualified securities.[4] (See *Hellum, supra*, 194 Cal.App.4th at pp. 1306-1307.) The appellate court reversed a judgment on a sustained demurrer, reasoning the plaintiffs' allegation that the three outside directors directly *or indirectly* controlled a lending entity, a corporation called Prosper Marketplace, Inc., were sufficient at the pleading stage. (See *id.* at pp. 1315-1318.) The *Hellum* court thought it enough the defendants had the power to control the general affairs of the corporation. (*Id.* at p. 1317.)

Secondarily, *Hellum* emphasized that control is often a *factual* question not readily susceptible to disposal on the pleadings. The court reasoned that dismissal based on insufficiency of allegations of control "is appropriate only when 'a plaintiff does not plead any facts from which it can reasonably be inferred the defendant was a control person.' [Citations.]" (*Hellum, supra*, 194 Cal.App.4th at p. 1317.) Thus the allegations in *Hellum* that the three outside directors had ownership interests in the company (to be sure, the three had a "collective" ownership interest exceeding 50 percent) giving them "significant voting power," plus their management responsibility under the company's by-laws, their presumptive authority to sign key corporate documents, and their affiliation with outside firms on which the company relied, all supported the "inference"

---

[4]    Like Panam Financial, the corporation in *Hellum* was in the lending business. Unfortunately for it, its basic business idea of selling loan notes to third party lenders raised the ire of the SEC, which determined the loan notes themselves were securities and needed to be either registered or determined to be validly exempt from registration. (See *Hellum, supra*, 194 Cal.App.4th at p. 1306.)

they could directly or indirectly influence the company's "corporate policies and decisionmaking." (*Id*. at pp. 1317-1318.)

Applying *Hellum* to the case at hand, we think the allegations of Bron's common control sufficient. While Bron personally only controlled about 40 percent of Panam Financial's stock, he still had "significant voting power" over the company. In *Hellum*, more than 50 percent was split three ways; here 40 percent is in the hands of one person and Bron's 40 percent "voting power" is further augmented by the absence of any indication anyone else was even close to his 40 percent at the time of the buyout. Additionally, there is his position as chairman of the board, his acknowledged power over the general affairs of the corporation, and the filings acknowledging his power to formulate key corporate policy. Together, as in *Hellum*, this congeries of facts readily supports an inference of at least indirect control, though such a conclusion seems no more than common sense anyway. A person who owns 40 percent of a company with the rest of the ownership not concentrated in any rival can easily put his allies on the board.[5]

Moreover, the complaint alleges all of Bron's fellow directors owe their jobs to him, so they are dependent on his good graces. And of course in other contexts dealing with questions of indirect control, courts have recognized that economic dependence means indirect control. (E.g., *S. G. Borello & Sons, Inc. v. Department of Industrial Relations* (1989) 48 Cal.3d 341, 355 [cucumber harvesters not independent contractors but really controlled by growers because economically dependent on them]; *Yellow Cab Cooperative, Inc. v. Workers' Comp. Appeals Bd.* (1991) 226 Cal.App.3d 1288, 1297-1298 [indicia of indirect control by taxi company over taxi drivers who were dependent on the company for business].)

---

[5]    For a period in its history, Panam Financial may, or may not, have had cumulative voting for its board of directors. But Bron and friends have not explained how the presence or absence of such voting would have so lessened Bron's ability to put his allies on the board that it would refute the natural inference of indirect control shown by his voting power and board chairmanship.

6

Like all reviews on demurrer, the standard of review in this case is a combination of giving the pleading the benefit of all facts properly alleged and reasonable inferences drawn therefrom, and then, in the light of those facts and inferences, deciding de novo whether the pleading has stated a cause of action. Under this standard, we conclude common control has been properly alleged.

B. *The Facts Under the Standard of Review*

Having taken eight paragraphs to explain how the standard of review controls the facts of the case before us, it will take us but one to set them forth: Bron founded Panam Financial in 1994. Basically, the corporation makes subprime loans on used cars, i.e., auto loans to the less-than-one-hundred-percent creditworthy. The company went public in the late 1990's. By 2006 the corporation's shares were selling at $26 per share, but the recession hit the company hard, and share prices dove to $5 per share at the beginning of 2008. By the end of 2008 share prices were as low as $1.59. However, Panam Financial management instituted a number of cost cutting measures (some draconian – including laying off 310 of its 469 employees), and reduced its portfolio of shaky auto loans, so that by May 2010, the Bron group thought the company a good opportunity to take private to benefit themselves. Accordingly, they developed a buyout scheme in which Bron and his partner, the Pine Brook Financial Group, would acquire the corporation's stock in the company on the cheap.[6] At the time, Bron owned 38 percent of the company's stock and controlled the board of directors. So the Bron group had the directors set up a supposedly independent special committee to value the stock for a buyout. The independent committee, however, didn't fight very hard for a

---

[6] Technically, the "merger" involved Panam Financial being merged into United Holdings Corp., a Delaware corporation. To emphasize the fact that the second amended complaint alleges this is a common control case governed by section 1312, subdivision (b), we will speak of the "merger" as a "buyout" of Panam Financial by "Bron and friends." In fact, the second amended complaint refers to the acquiring entity as the "Buyout Group," not "Unitas Holdings." Even so, this is not a case of a classic merger involving a big fish gobbling up a small fish. The facts as alleged in the second amended complaint show this reorganization to be better described as a "management buyout."

7

good price, and in mid-November 2010 the committee agreed to a price of $7.05 a share. The $7.05 per share price was clearly a bargain for the Bron group, because the book value of the company was no less than $8.54 at the time. On December 27, 2010, the special committee and the board recommended the shareholders approve the buyout of Panam Financial by the Bron group. The buyout was announced the next day, December 28, 2010.

C. *The Litigation*

On January 11, Busse filed a class action for breach of fiduciary duty. The original complaint sought an injunction against the proposed buyout, but added that if the buyout was consummated prior to the judgment in the action, plaintiffs would accept either rescinding the "transaction" (presumably meaning setting aside the buyout) *or* an award of what they called "rescissionary damages." Nine days later, the Bortels followed suit, also alleging breach of fiduciary duty, and also seeking an injunction to prevent the reorganization, and alternatively asking for "compensatory damages" if the buyout was consummated.

No injunction was obtained. On February 24, 2011, the buyout was approved by a vote of the outstanding shares, though the vote was relatively close, about 4.8 million shares for to 4 million shares against. As far as our record shows, the buyout was consummated sometime after February 24, 2011.

Busse's and the Bortels' cases were consolidated in May 2011. By July, Busse and the Bortels had filed an amended complaint, seeking rescission, but again asking for rescissionary damages in the alternative. After several rounds of demurrers, the minority shareholders filed a second amended complaint (the operative one for purposes of this appeal), alleging two causes of action based on the facts above, namely breach of fiduciary duty under subdivision (b) of section 1312, and aiding and abetting breach of fiduciary duty under subdivision (b) of section 1312. Even under the second

8

amended complaint, however, the minority shareholders were still seeking to rescind the buyout approved in February 2011 if they could not obtain rescissionary damages.

The trial court sustained the Bron group's demurrer to the second amended complaint, reasoning along two lines: First, subdivision (b) of section 1312 does not allow for damages, even when "couched" as an "equitable remedy" under the rubric of rescissionary damages. Additionally, the second amended complaint did not sufficiently allege "Bron's common control." The minority shareholders then timely filed this appeal.

## III.  DISCUSSION

A.  *Damages, By Any Other Name*

1.  *Preliminary Considerations*

The minority shareholders' claim for "rescissionary damages," centers on a single phrase in subdivision (b), which states that in common control situations "subdivision (a) shall not apply." [7]  As the minority read subdivision (b), in the absence

---

7    For easy reference, we quote the entirety of section 1312 in this footnote:

"(a) No shareholder of a corporation who has a right under this chapter to demand payment of cash for the shares held by the shareholder shall have any right at law or in equity to attack the validity of the reorganization or short-form merger, or to have the reorganization or short-form merger set aside or rescinded, except in an action to test whether the number of shares required to authorize or approve the reorganization have been legally voted in favor thereof; but any holder of shares of a class whose terms and provisions specifically set forth the amount to be paid in respect to them in the event of a reorganization or short-form merger is entitled to payment in accordance with those terms and provisions or, if the principal terms of the reorganization are approved pursuant to subdivision (b) of Section 1202, is entitled to payment in accordance with the terms and provisions of the approved reorganization.

"(b) If one of the parties to a reorganization or short-form merger is directly or indirectly controlled by, or under common control with, another party to the reorganization or short-form merger, subdivision (a) shall not apply to any shareholder of such party who has not demanded payment of cash for such shareholder's shares pursuant to this chapter; but if the shareholder institutes any action to attack the validity of the reorganization or short-form merger or to have the reorganization or short-form merger set aside or rescinded, the shareholder shall not thereafter have any right to demand payment of cash for the shareholder's shares pursuant to this chapter.  The court in any action attacking the validity of the reorganization or short-form merger or to have the reorganization or short-form merger set aside or rescinded shall not restrain or enjoin the consummation of the transaction except upon 10 days' prior notice to the corporation and upon a determination by the court that clearly no other remedy will adequately protect the complaining shareholder or the class of shareholders of which such shareholder is a member.

9

of subdivision (a), shareholders enjoy the *common law* right to sue a controlling majority of corporate insiders for breach of fiduciary duty, even if the alleged breach only arises out of conduct in the course of a corporate reorganization. And that suit would include the right to damages. But our interpretation of the statute does not allow for damages.

"In construing a statute, our fundamental task is to ascertain the Legislature's intent so as to effectuate the purpose of the statute." (*Smith v. Superior Court* (2006) 39 Cal.4th 77, 83.) There is a classic sequence in discussing problems of statutory construction, as solid in its approach to the issue of ascertaining textual meaning as the queen's gambit is to safe openings in a game of chess. (See *Halbert's Lumber, supra*, 6 Cal.App.4th at p. 1238 ["There is order in the most fundamental rules of statutory interpretation if we want to find it. The key is applying those rules in proper *sequence*."].) The classic sequence of discussing statutory construction is: First look at the text, if it's plain and unambiguous, stop there. If the text is not plain and unambiguous, go to legislative history. If there is evidence of clear legislative intent, implement that intent, and stop there. If there is no clear evidence of intent, use reason, practicality and common sense to ascertain what best approximates the legislative intent. (See *Kachlon v. Markowitz* (2008) 168 Cal.App.4th 316, 337-338; *Halbert's Lumber, supra*, 6 Cal.App.4th at pp. 1237-1240; see also *J.A. Jones Construction Co. v. Superior Court* (1994) 27 Cal.App.4th 1568, 1578 [importance of clarity in legislative history].)

There is, however, another principle of statutory interpretation that fits especially well the situation where the statute is less than clear, yet the Legislature has amended it at a time when there was some case law interpreting it. The principle is that

---

"(c) If one of the parties to a reorganization or short-form merger is directly or indirectly controlled by, or under common control with, another party to the reorganization or short-form merger, in any action to attack the validity of the reorganization or short-form merger or to have the reorganization or short-form merger set aside or rescinded, (1) a party to a reorganization or short-form merger which controls another party to the reorganization or short-form merger shall have the burden of proving that the transaction is just and reasonable as to the shareholders of the controlled party, and (2) a person who controls two or more parties to a reorganization shall have the burden of proving that the transaction is just and reasonable as to the shareholders of any party so controlled."

10

the Legislature is "presumed to know about existing case law when it enacts or amends a statute." (E.g., *In re W.B.* (2012) 55 Cal.4th 30, 57 [noting Legislature "did not signal an intent to supersede" a prior appellate decision involving how dependency courts should inquire into possible native American ancestry when it enacted statute governing such inquiries]; *People v. Overstreet* (1986) 42 Cal.3d 891, 897 ["the Legislature is deemed to be aware of existing laws and judicial decisions in effect at the time legislation is enacted and to have enacted and amended statutes '"in the light of such decisions as have a direct bearing upon them."'"].)

This principle is important because it focuses our attention on what one might expect to be there if a given interpretation were correct, but isn't. For example, in *W.B.*, our Supreme Court noted that if the Legislature had intended, in enacting a certain statute, to expand the reach of a certain federal law, one would have expected evidence of such "intent to feature prominently in the legislative history." (*W.B., supra*, 55 Cal.4th at p. 56.) The *W.B.* court thus found it significant that there was no evidence of any such intent. (*Ibid.*)

The case before us is perfectly suited to application of this variation on the classic approach to laying out the problem of ascertaining legislative intent. Section 1312 is not the most pellucid of statutes, a fact noted twice by our high court in *Steinberg*. (See *Steinberg, supra*, 42 Cal.3d at pp. 1205-1206 ["the scope of the prohibition stated in this section is not clear"] & p. 1207 ["The language of section 1312(a) does not provide a ready answer, for it is not entirely clear whether such a claim amounts to an attack on the 'validity' of the merger."].) But when one examines the judicial history of section 1312, any mystery as to the Legislature's intent seems to dissipate. Taking our cue from *W.B.*, we find no evidence the Legislature wanted, in subdivision (b) to establish or even recognize a monetary remedy that hadn't previously been there (at least after 1931). It merely wanted to add one additional big, but wholly *equitable* stick to the remedies minority stockholders already had – the ability to sue to set aside a reorganization.

11

## 2. *A Not So Brief History of Section 1312*

It all started in 1931 with the enactment of (now former) Civil Code section 369.  Before that, any shareholder could block a merger by withholding consent.  (See *Gallois v. West End Chemical Co.* (1960) 185 Cal.App.2d 765, 771.)  There were "two principal reasons" for the enactment of the statute:  one was to "permit mergers over the objection of a defined minority of shareholders" while the other was to give such minority shareholders the chance to obtain compensation for their stock.  (*Ibid.*)

The statute was given its first judicial consideration some eight years after its enactment, in *Beechwood Securities Corp. v. Associated Oil Co.* (9th Cir. 1939) 104 F.2d 537, where minority shareholders wanted to set aside a merger they considered disadvantageous to their own interests, so they attacked the statute as an unconstitutional deprivation of private property.  The Ninth Circuit turned back the constitutional challenge (*id*. at pp. 540-541) in an opinion stressing the complexity of trying to unwind a merger.  (See *id*. at p. 541 [noting the "injustice of disturbing the vast and complicated interests of the consolidated companies because of a contention which the dissentient shareholder had not raised"].)  The *Beechwood* court then summarized the law, as if speaking to a disappointed minority shareholder, in vibrant language that would be quoted 47 years later in *Steinberg*:  "In effect, these code sections, as construed by both parties, say to a shareholder, 'When you buy stock in a California corporation you are advised that your associate shareholders holding two-thirds of the shares may consolidate your corporation with another into a third corporation, offer you what they please of its shares in exchange for those you hold, and, *if you do not like the offer, may buy out your shares at their fair market value at the time they vote the consolidation*.'"  (*Id*. at p. 540; see also *Steinberg, supra*, 42 Cal.3d at p. 1206, fn. 11 [quoting same passage].)

When *Beechwood* was decided in 1939, there was no equivalent to what is today section 1312, subdivision (b).  But there was an equivalent of section 1312, subdivision (a), namely former Civil Code section 369, subdivision (17), which the court

12

helpfully quoted in a footnote.[8] And *Beechwood* prompted a law review article strongly defending the decision written by one of the drafters of the 1931 legislation, Professor Henry Winthrop Ballantine of Boalt Hall (see *Gallois, supra*, 185 Cal.App.2d at p. 772), along with his colleague, Graham L. Sterling. (See Ballantine & Sterling, *Upsetting Mergers and Consolidations: Alternative Remedies of Dissenting Shareholders in California* (1939) 27 Cal.L.Rev. 644, 652 (hereinafter "Ballantine & Sterling 1939 article"). The clear import of the article is that when it comes to corporate reorganizations, the needs of the many – at least measured by the shares they own – outweigh the needs of the few. (See also *Steinberg, supra,* 42 Cal.3d at p. 1205 [explaining the origins of appraisal statutes generally].[9]) Hence the authors minced no words about what they considered the lamentable tendency of some minority shareholders to try to "extort" (a word indicative of the authors' tone in the article) by holding up economically beneficial reorganizations.[10]

---

[8]        Former Civil Code section 369, subdivision (17) provided: "The rights and remedies of any shareholder at law or in equity to object to or litigate as to any such merger or consolidation shall be and are hereby limited to the right to receive the fair market value of his shares in the manner and upon the terms and conditions provided in this section, except actions to test whether the number of legal votes of shareholders required by statute to authorize or approve the proposed action of the corporation has been given." (*Beechwood, supra*, 104 F.2d at p. 538, fn. 1.)

[9]        The whole passage is worth quoting, if only for the general history of appraisal statutes and to show that in 1986 our high court was still relying on Ballantine and Sterling's reading of the statute: "Every American state except West Virginia has an appraisal statute. At common law, consent of all stockholders of a corporation was necessary to accomplish basic changes in corporate structure. This was a severe impediment to the ability of the majority to effect reorganizations; a minority, by refusing to agree to a merger, or by demanding an unreasonable amount for their shares as a condition to agreement, could delay or thwart a merger altogether. To solve this problem, appraisal statutes were enacted, enabling the majority to effect a merger, but the minority were granted the right to receive fair cash value for their shares, with the remedy of appraisal in the event of a disagreement. Thus, the minority could not victimize the majority by failing to cooperate in the merger plan, but they were not at the mercy of the majority as to the value of the shares of the merged corporation. (See 1A Ballantine & Sterling, Cal. Corporation Laws (4th ed. 1986) § 262.05, pp. 12-75 to 12-76; 12B Fletcher, Cyc. Corp. (Perm. ed.) § 5906.1, pp. 342-343; 15 Fletcher, *supra*, § 7165, p. 297.)" (*Steinberg, supra*, 42 Cal.3d at pp. 1204-1205.)

[10]        The descriptive language they used was quite piquant: "sabotage the joint enterprise," "piratical minorities," "protect the majority against outrageous extortion and obstruction," "piratical obstructionists" "extortionate corporate litigation" "blackmail and extortion against a majority." (Ballantine and Sterling 1939 article, *supra*, 27 Cal.L.Rev. at pp. 645, 648, 649, 651.)

Ballantine and Sterling emphasized an interesting fact about the *Beechwood* decision – it clearly arose out of a common control situation. There, a parent owned more than 98 percent of two companies which were then merged into the parent. The minority stockholders of one of the companies basically thought they were getting a much worse exchange rate than the stockholders of the other company. (See Ballantine and Sterling 1939 article, *supra*, 27 Cal.L.Rev. at pp. 652-655.)

In 1947, former Civil Code section 369 was converted into former Corporations Code section 4123, which was then followed by former sections 4300 to 4318, which actually laid out the process of an appraisal remedy. (See *Gallois, supra*, 185 Cal.App.2d at p. 771.) The first evaluation of the statute in its new Corporations Code incarnation came in *Gallois, supra*, 185 Cal.App.2d 765. Like *Beechwood*, *Gallois* arose out of a reorganization in the common control context. A certain investment group owned, respectively, 56 and 30 percent of two classes of stock in a company, and used its control to merge the company into another company of which it owned, respectively 16 and 37 percent of the same respective classes of stock. The terms of the merger meant one stockholder in the original company was going to receive $1.30 a share for his stock, even though the terms of the class of that stock specified it could be "called" at a much lower price, namely $1.05 per share. The stockholder, however, offered an interesting theory as to why his stock was worth more than $1.30: The word on the street was the company which lost its identity in the merger would never "call" the stock at all, because if it did, the investment group who controlled it would suffer serious tax consequences. (See *id*. at p. 679.) In the process of affirming the award at $1.30 – at root *Gallois* was a substantial evidence case – the court had occasion to examine the history of former section 4123 from its origins in 1931 to 1960, and demonstrate that the point of the legislation was to allow mergers even if there were dissenting stockholders, but also to give those stockholders a "means of getting compensation" for their stock. (*Id*. at p. 771.)

14

From 1931 to 1947 the statute grew longer, but the key language precluding attacks on reorganizations "at law or in equity" except for appraisal remained.[11] In 1966, former section 4123 again came under appellate scrutiny in *Giannini Controls Corp. v. Superior Court of Los Angeles County* (1966) 240 Cal.App.2d 142, and, yes, the litigation again arose out of a common control reorganization. Like *Gallois*, it was an appraisal case, but with an intriguing element. In *Giannini*, a New York corporation owned 80 percent of the shares of a California corporation, and the New York corporation wanted to buy out the remaining 20 percent of the stock, held as it turned out, by one stockholder. That stockholder, however, objected that the price was not fair to him. (*Id*. at pp. 144-145.) The hook was that the California Commissioner of Corporations sympathized with the holdout stockholder, and so refused to issue a certificate to allow the merger to be consummated. The case reached the Court of Appeal, then, via the New York corporation's writ proceeding against the Commissioner, challenging his refusal to issue the certificate. (*Id*. at pp. 149-150.) And, in fact, the trial court agreed with the Commissioner, denying the requested writ.

The appellate court reversed, reasoning that under the law the Commissioner had no choice. (See *Giannini, supra*, 240 Cal.App.2d at pp. 154-156.) The important point of the opinion for our purposes is that the *Giannini* court issued a strong assertion of the *exclusivity* of the holdout stockholder's appraisal remedy. In fact, it quoted Ballantine and Sterling's general corporate law treatise in echoing its concern

---

[11] Quoting from the 1947 version of the statute:

"When the merger or consolidation of a corporation with one or more other corporations, domestic or foreign, has been approved by the requisite number of its shareholders, no shareholder of the corporation *shall have any right at law or in equity to attack the validity of the merger or of the consolidation, or to have the merger or consolidation set aside or rescinded*, except in an action to test whether the number of shares required by statute to authorize or approve the merger or consolidation have been voted in favor thereof by persons legally entitled to vote them; but any holder of shares of a class whose terms and provisions specifically set forth the amount to be paid in respect to them in the event of consolidation or merger is entitled to payment in accordance with those terms and provisions, and any other shareholder who did not approve the merger or consolidation at the meeting at which it was approved is entitled to receive the fair market value of his shares in the manner and upon the terms and conditions provided in Article 2 of this chapter." (See Stats. 1947, ch. 1038, pp. 2380-2384, italics added.) Article 2 consisted of former sections 4300 through 4318, which detail appraisal procedures similar to those in current sections 1300 through 1313.

15

that the point of the statutory scheme was to prevent extortion of the many by the few: "The statutory procedures whereby the dissenting shareholder may demand and receive cash for his shares in an amount equal to their fair market value, *is exclusive of other legal and equitable remedies by which minority shareholders might seek to enjoin or attack changes such as a merger or consolidation*, except on the question of an insufficient vote to authorize a merger or consolidation.  (Corp. Code, § 4123.)  It has been said in this connection that 'It was deemed advisable *to protect the majority against strike suits by abrogating equitable remedies by way of injunction or rescission to litigate charges of fraud or unfairness, which may be used to extort a settlement by obstruction of a transaction duly authorized*.'  (Ballantine on Corporations (1946), p. 703.)  Professor Ballantine was speaking with reference to the provisions of former section 369 of the Civil Code, the substance of which has now been incorporated in sections 4109 et seq. of the Corporations Code. 'The crucial point at issue in equitable suits for rescission and also for preventive relief against merger or consolidation is after all usually one of price, as to the true exchange value of the dissenting shares, perhaps of only a small number of shares.  The confining of litigation with dissenters to the question of value and compensation simplifies the issues to be tried and protects all parties.'  (Ballantine on Corporations, *supra*.)"  (*Gianinni, supra*, 240 Cal.App.2d at pp. 154-155, italics added.)  *Notanda bene*:  no damages.

The final case in the journey to 1975's enactment of section 1312 was *Jackson v. Maguire* (1969) 269 Cal.App.2d 120.  *Jackson* arose out of litigation in which cashed-out minority shareholders in one of the divisions of the conglomerate sought additional consideration for their shares.  The trial court disagreed, and substantial evidence supported the trial court's finding so the judgment was affirmed.  (See *id*. at p. 128 ["We, thus, have a record which shows that the full reasonable market value of the stock was paid."].)  The appellate court also had occasion to opine, "in passing," that the

16

remedy of appraisal provide by the statutory scheme of former sections 4300 through 4318 was "exclusive." (*Id.* at p. 131.)

Beechwood, *Gallois, Giannini* and *Jackson* thus formed the existing case law construing former section 4123, as it stood going into 1975, when the Legislature recodified the statute into what is now section 1312, subdivision (a) and, at the same time, added new section 1312, subdivision (b), plus reincarnating the process-of-appraisal statutes into new sections 1300 through 1311. At least three of the four cases leading up to the 1975 enactment involved common control situations.[12]

It fell to the court in *Sturgeon Petroleums, Ltd. v. Merchants Petroleum Co.* (1983) 147 Cal.App.3d 134, to first explore the statutory scheme enacted in 1975, its current form. *Sturgeon* involved this scenario: Oil company M was to be merged into Oil company D. The merger was approved by an "'overwhelming'" majority of the shares of the M company. The shareholders of M company who voted against the merger were offered a price of $2.94 for their shares, but they demanded to be cashed out at $12 per share. The D company then took the initiative and *it* filed an appraisal action under section 1304. The dissenting M company stockholders countered with an action for damages based on breach of fiduciary duty against M company, its respective board members, D company, and its board chairman. (*Sturgeon, supra*, 147 Cal.App.3d at pp. 136-137.) D company then sought summary judgment on the theory appraisal was the plaintiffs' exclusive remedy. The trial court granted it and the appellate court affirmed.

The *Sturgeon* court had this insight: The language of section 1312, subdivision (a) "taken at face value," indeed "might possibly be susceptible" to the interpretation it does *not* preclude "'direct actions for damages if fraud or other

---

[12] It's not clear what the respective control percentages in *Jackson* were, since most of the opinion simply quotes portions of the statement of decision. (See *Jackson, supra*, 269 Cal.App.2d at pp. 126-128.)

17

misconduct can be shown.'" (*Sturgeon, supra*, 147 Cal.App.3d at p. 139.)[13]  But the *Sturgeon* court rejected that interpretation as *not* "the most reasonable one." (*Sturgeon, supra*, 147 Cal.App.3d at p. 139.)  The court noted that authorities prior to 1983 (including *Beechwood*, *Giannini*, *Jackson* and the Ballantine and Sterling 1939 article) held recovery of fair market value of shares was the "'only remedy'" of a dissenting stockholder (other than testing the validity of the vote). (*Id*. at pp. 139-140.)  The court then pointed out that section 1312 subdivision (a) was a "reenactment" of former section 4123, and specifically noted that subdivisions (b) and (c) were not in the prior statute.  The *Sturgeon* court opined that subdivision (b) presented a "limited exception" to what would otherwise happen if subdivision (a) were operative. (See *Sturgeon, supra*, 147 Cal.App.3d at p. 140.)  Significantly, however, the *Sturgeon* court did not elaborate on the nature of the "limited exception" represented by the arrival of new subdivisions (b) and (c). (*Id*. at p. 140.)

Then came the California Supreme Court opinion in *Steinberg*.  The *Sturgeon* decision survived *Steinberg* scrutiny quite nicely; the two decisions are on the same wavelength.  *Steinberg* put its imprimatur on *Sturgeon's* basic conclusion that in subdivision (a) situations, appraisal is the exclusive remedy.[14]  Like *Sturgeon*, *Steinberg* noted that subdivision (b) is framed as an exception to subdivision (a).  And like *Sturgeon*, *Steinberg* also chose not to explore the nature of subdivision (b)'s limited

---

[13]     Ironically the internal quotes representing the minority shareholder's position were taken by them from a treatise by Ballantine and Sterling. (See *Sturgeon, supra*, 147 Cal.App.4th at p. 139, noting appellants were relying on language from 1A Ballantine and Sterling, Cal. Corporation Laws (4th ed. 1982) § 262.05[8][c], pp. 12-88 & 12-89.)

[14]     See footnote 2, *ante*, for a small qualification.

18

exception to subdivision (a).[15]  Finally, like *Sturgeon*, *Steinberg* was clearly a non-common control subdivision (a) case, so an investigation into the meaning of subdivision (b) was not necessary.

But there was a lot more to the *Steinberg* decision than just its holding there are no damages in subdivision (a) situations.  For one thing, *Steinberg* followed *Sturgeon* in spotting a certain ambiguity in the language of section 1312, subdivision (a).  And, like *Sturgeon*, *Steinberg* reached its result by noting the context and history of the statute to arrive at the more reasonable of two possible interpretations.  Thus *Steinberg* considered section 1312 in the context of the whole of chapter 13 (see *id*. at pp. 1201, 1209), and, in fact, self-consciously tested its result against the strong reagent of the idea that the result in the case was allowing wrongdoers to go unpunished.  (See *id*. at p. 1211.)  Only after considerable weighing of the statute in the context of its history, and noting the "balancing" it involved (see *id*. at p. 1214), did the court announce its conclusion that, at least where the plaintiff was "aware of all facts leading up to his cause of action for alleged misconduct in connection with the terms of the merger prior to the time the merger was consummated but deliberately opted to sue for damages instead of seeking appraisal, did section 1312(a) act as a bar." (*Ibid.*)[16]

---

[15]     *Steinberg* expressly dealt with subdivision (b) in only one brief passage, and the passage was merely framing an argument made by one of the parties, and apparently taken from the similar "limited exception" passage in *Sturgeon*.  Here is the entire passage.  We highlight the fact the high court chose not to go into much detail about the subdivision (b) exception: "Second, defendants claim that because the Legislature has provided in subdivision (b) of section 1312 an exception to section 1312(a), it must have viewed appraisal as the exclusive remedy whenever the exception does not apply.  While the existence of an exception indicates that shareholders who do not come within it are limited in some respect as to the remedies they may invoke, *this fact does not shed much light on the scope of such limitation, particularly since the exception itself is expressed substantially in the language of section 1312(a).*" (*Steinberg, supra*, 42 Cal.3d at p. 1208, italics added.)

After the passage, the court would quote subdivision (b) in a footnote, and then launch in to its basic analysis, including emphasizing that appraisal was an adequate remedy even when there is a breach of fiduciary duty.  (See *id*. at pp. 1208-1209, and particularly p. 1209.)  In any event, the passage from *Steinberg* quoted above, which merely tells us what *defendants* were telling the court, cannot be viewed as establishing anything more than that subdivision (b) does not throw much light on subdivision (a).

[16]     The qualification relating to awareness does not affect the case before us, as shown by the minorities' January 2011 complaints filed before the time the merger was consummated in February.  By that time they were certainly aware of whatever the Bron group might have been up to in having Panam Financial sold to themselves.

But perhaps the most remarkable aspect of *Steinberg* is its endorsement of appraisal as a truly *adequate* remedy. *Steinberg* pointed out that even breaches of fiduciary duty could be redressed in appraisal proceedings, because any difference between the true value of the minority stockholder's shares and the value offered minority shareholders could readily be accounted for in the appraisal.[17] (See *Steinberg, supra*, 42 Cal.3d at pp. 1209-1210.)

And finally, to validate our understanding of *Steinberg,* we consider the dissent. *Steinberg* was a four-three decision, and Chief Justice Bird made no effort to hide her displeasure with the majority's result. But she accepted the implication of the historical origins of section 1312 – 40 years previously the Legislature had seen dissenting shareholders as "'piratical obstructionists.'" (See *Steinberg, supra*, 42 Cal.3d at p. 1216, quoting Ballantine and Sterling's 1939 article (dis. opn. of Bird, C. J.).) However, she decried the original view as "'anachronistic'" as shown by unidentified "current events." (*Id.* at pp. 1216-1217.) For Presiding Justice Bird, and her colleagues Justices Reynoso and Grodin, the majority result was a "license to commit fraud," (*id.* at p. 1220) and appraisal was not a remedy which could "adequately compensate those individuals who have been damaged in a corporate merger or reorganization." (*Id.* at p. 1214.) Clearly, the dissent read *Steinberg* as we do. [18]

Only one published opinion, *Singhania v. Uttarwar* (2006) 136 Cal.App.4th 416, has addressed section 1312 since *Steinberg*. *Singhania* was an attempt by disappointed shareholders to find some room to maneuver around section 1312, subdivision (a) and *Steinberg's* interpretation of it in two alleged facts: One, they had not

[17] Indeed, to add our own two-cents as a gloss to *Steinberg's* point, a related statute, section 1305, has a one-way attorney and expert fee provision in case the reorganization offer is too low by a certain percentage.

[18] A coda on *Steinberg*: Just as *Beechwood* generated a law review article from one its partisans defending the court's decision, so did *Steinberg*. In *Steinberg's* case, the article came from Robert Dunn, who had been lead counsel for the defendants. (See Dunn, *Steinberg v. Amplica: The California Supreme Court Holds Appraisal to be the Dissenting Shareholder's Exclusive Remedy* (1988) 22 U.S.F. L.Rev. 293 ("Dunn's Steinberg Article").) The article asserted that Presiding Justice Bird's argument that "the *entire* statutory appraisal remedy is inadequate" was better made to the Legislature than the court. (*Id.* at p. 313.)

been provided with a statement of fair market value of their shares in the materials sent them prior to a merger by their corporation, as is actually required by section 1301. (See *Singhania, supra*, 136 Cal.App.4th at p. 430.) And two, the misconduct of their company's management, in not providing sufficient information about the merger (and hiding some information, like management receiving stock without consideration), effectively deprived them of the opportunity to make an *informed* decision as to whether to accept the merger terms (which would mean receiving stock in the company gobbling up theirs, plus some other consideration). The defendants successfully demurred to the plaintiffs' fourth amended complaint, and the appellate court affirmed; section 1312, subdivision (a)'s "bar" held. (*Id*. at p. 430.)

As to the first assertion, the *Singhania* court's analysis was that the omission of the fair market value in the information materials sent to the shareholders didn't prejudice the plaintiffs: They knew their corporation had a legal duty to state a fair market value (per § 1300), they didn't use their right to make a lawful demand to inspect corporate records (see §§ 1600 et seq.), the omission of a fair market value was functionally no different from a deflated statement – as is usually alleged (and was in *Steinberg*) – and, in any event, the shareholders were still safeguarded by the fact they could obtain the fair market value of their shares in an appraisal. (See *Singhania, supra*, 136 Cal.App.4th at pp. 430-433.) As to the misconduct, there was no allegation the plaintiff shareholders had been misled by the misinformation or material nondisclosures into keeping their stock instead of cashing out. Their failure to exercise their dissenters' rights was their own "de facto choice" to accept the reorganization. (*Id*. at p. 434.) Moreover, there was no misconduct in the actual process of the merger, i.e., it wasn't a case where the plaintiff shareholders were shorted what they were supposed to receive from the company into which their former company had been merged. (*Id*. at pp. 434-435.)

21

In sum, then, the meaning of section 1312, subdivision (a), both in its incarnations before and after it became section 1312, is unmistakable:  Disappointed minority shareholders cannot sue to stop or rescind a merger, and are limited to the remedy of appraisal.  That is an adequate remedy because the appraisal can take into account breaches of fiduciary duty by corporate insiders.  We are now in a position to examine what the Legislature intended when it enacted section 1312, subdivision (b).

3. *The Meaning of Subdivision (b).*

a. *What Subdivision (b) Doesn't Say*

With this background, we may now examine the minority shareholders' core argument in this case.  The minority read subdivision (b) to provide that in the absence of subdivision (a) application, shareholders retain common law rights, including the right to sue a controlling majority for monetary damages for breach of fiduciary duty.

We reject the argument for two reasons.  The first we have alluded to already:  The historical context in which subdivision (b) was first enacted.  As we have seen, by 1975, a string of California cases had already held that appraisal was the exclusive remedy of dissenting shareholders.  The Legislature must be presumed to have been aware of these cases in 1975 when it enacted subdivision (b).  Going into 1975, then, there was no residuum of common law remedies in the reorganization context

22

which would exist but for the interposition of subdivision (a).[19] The enactment of subdivision (b) did not involve a situation in which the Legislature was *restoring* a remedy that subdivision (a) otherwise took away. Rather, when subdivision (b) was enacted in 1975, the question was whether the Legislature would *create* something that clearly wasn't there.

Silence often speaks loudly when it comes to ascertaining the intent behind text. (E.g., *Citizens Assn. of Sunset Beach v. Orange County Local Agency Formation Com.* (2012) 209 Cal.App.4th 1182, 1191 [silence in initiative on question of impact on annexations indicated a lack of voter intent that initiative apply to annexations].) In *In re W.B., supra,* 55 Cal.4th at page 57, for example, our Supreme Court rejected the idea the Legislature wanted to expand the coverage of a certain law when it amended a juvenile dependency statute because there was no indication the Legislature wanted to "supersede" the prior decision.

Here, similarly, we have no indication the Legislature, in enacting subdivision (b), wanted to give subdivision (b) plaintiffs a right to monetary damages which, under *Beechwood*, *Gallois*, and *Gianinni*, they clearly did not have at the time. The silence is particularly loud given that those three cases had arisen out of common

---

19    The idea, as suggested by minority's briefing, that the existence of fiduciary duties on the part of corporate directors to minority stockholders was created ex nihilo, like some exotic massless subatomic particle, in the 1969 case of *Jones v. H.C. Ahmanson & Co., supra*, 1 Cal.3d 93, does not hold up to examination. The California Supreme Court made clear directors have fiduciary obligations to shareholders at least as early as 1940. (*American Trust Co. v. California Western States Life Ins. Co.* (1940) 15 Cal.2d 42, 63.) Indeed, the Court of Appeal declared such duties very plainly at least as early as 1932. (See *Pasadena Mercantile Finance Corp. v. De Besa* (1932) 122 Cal.App. 575, 578 ["Defendants, as directors of plaintiff corporation, occupied a fiduciary relation to the corporation and its stockholders. Having been entrusted with the management of the corporate property for the common benefit of the stockholders, directors, by their acceptance of office, preclude themselves from doing any act or engaging in any transaction in which their private interests conflict with the duty they owe to the stockholders, and from making any use of their power or of the corporate property to secure to themselves an advantage not common to all stockholders."]; see also *Remillard Brick Co. v. Remillard-Dandini Co.* (1952) 109 Cal.App.2d 405, 419 [collecting authorities to the effect that "It is hornbook law that directors, while not strictly trustees, are fiduciaries, and bear a fiduciary relationship to the corporation, and to all the stockholders. They owe a duty to all stockholders, including the minority stockholders, and must administer their duties for the common benefit. . . . Directors owe a duty of highest good faith to the corporation and its stockholders. It is a cardinal principle of corporate law that a director cannot, at the expense of the corporation, make an unfair profit from his position."].)

23

control situations, so the 1975 amendments presented the perfect opportunity to say that monetary damages could be sought if a reorganization did involve common control.

The second reason we reject the minority shareholders' reach for damages is our perception of how section 1312 fits within the entire context of the then-surrounding statutory scheme, sections 1300 through 1313.  The minority shareholders read subdivision (b) at something like a quantum level – focusing on but one part of a single phrase in the introductory sentence, "subdivision (a) shall not apply" – with almost no further examination.   But statutory texts cannot be read in isolation; we must consider the context of the statutory scheme of which they are a part.  (E.g. *Clean Air Constituency v. California State Air Resources Bd.* (1974) 11 Cal.3d 801, 814 [court "should construe every statute with reference to the entire scheme of law of which it is part so that the whole may be harmonized and retain effectiveness"].)

Reading chapter 13 as a whole, a unified theory of how the Legislature elected to treat dissenting minority shareholders in corporate reorganizations emerges:  In non-common control situations, dissenting minority shareholders have the remedy of appraisal but do not have the remedy of stopping or rescinding the reorganization.  In common control situations, dissenting minority shareholders *still* have the remedy of appraisal *unless* they elect the remedy of stopping or rescinding the reorganization.  But they never have the remedy of seeking monetary damages.

In that regard we are particularly struck by section 1309, subdivision (c), which says shareholders who do not avail themselves of an appraisal remedy "cease to be entitled" to be cashed out by the corporation for their shares.  The importance here is that since *Steinberg* is clear that appraisal is an adequate remedy for common law breach of fiduciary duty, allowing a common law remedy for monetary damages under section 1312, subdivision (b) would run counter to the operation of section 1309.  It would allow dissenting shareholders to avoid the appraisal process because they could still be effectively cashed out in later litigation.

24

Moreover, a monetary remedy in subdivision (b) – outside the well-delineated appraisal remedy provided for in section 1304 – would also tend to subvert the appraisal remedy itself and allow the kind of gamesmanship the statutes indicate the Legislature sought to avoid by passing section 1308. Specifically, sections 1302 and 1304 set out strict time limits to exercise the appraisal remedy, while section 1308 prevents the dissenting shareholder from reneging on a demand for a cashout without the corporation's consent. Section 1308 was obviously included to prevent dissenting shareholders from giving themselves a free stock option in the event that after the reorganization share prices declined. A common law remedy for monetary damages would allow dissenting stockholders to hedge their bets by disclaiming an appraisal remedy on the theory the company's offer was sub-market as a result of breach of fiduciary duty, and if the gamble didn't pay off because share prices unexpectedly went down, they could simply dismiss their case. The effect would be the same as a free stock option. We cannot ascribe that intent to the framers of the statutory scheme.

b. *And What Subdivision (b) Does Say*

Of course, resolving what subdivision (b) doesn't say does not tell us what subdivision (b) does say. Recall that the overarching theme of both *Beechwood* and Ballantine and Sterling's 1939 article was the intolerability of the uncertainty created by a suit to set aside or rescind a merger. However, by 1975 the potential for abuse in common control situations was known, and something more than just appraisal as a remedy *was* perceived to be needed by the Legislature. (See Dunn's Steinberg Article, *supra*, 22 U.S.F. L. Rev. at p. 314 ["The scope of exclusivity of the appraisal remedy has been narrowed by the legislature to exclude those cases in which abuses might be expected. Most notably, the appraisal remedy is not exclusive if there is common control of the acquiring and acquired corporations."].)

That something more was what *Beechwood* and Ballantine and Sterling in 1939 would have seen as the horror of the uncertainty of litigation which might, or might

25

not, result in unwinding a merger – or, to use the metaphor employed at oral argument at the trial court in this case – the unscrambling of an egg. The Legislature faced that eventuality. It recognized, at least on an intuitive level, that unlike most buyer and seller scenarios where the seller knows more about what's being sold than the buyer, the natural order is reversed in common control situations. In common control scenarios, management has better and quicker access to information about a company's prospects than its stockholders and yet it's management who are the *buyers*. For example, as an economy comes out of a recession and the company's prospects start looking up, insiders will know about the good news first. A common control situation involves, in effect, management dealing with itself.

Common control under subdivision (b), then, is one of those times when the Legislature is willing to allow a little dice to be played over the survivability of a corporate reorganization. Subdivision (b) is like physicist Schrödinger's famous cat in a box, which might, or might not, have been exposed to a puff of deadly gas. If a management buyout were analogized to that cat, one would never know if the box contains a live cat or a dead cat until the outcome of the set-aside litigation becomes final and the box, so to speak, is opened. Given the history of subdivision (a) with its antipathy to litigation seeking to set aside corporate reorganizations, it is evident that the Legislature had a different attitude for subdivision (b) common control situations: It was willing to tolerate some dead cats to keep management honest.

The availability of set aside is also the way the Rutter Group Corporate treatise commentators read the statute. We should add, as the Treatise notes, that if dissenting shareholders do choose the big stick of a set aside remedy, they obviously cannot also have the alternative of an appraisal. (See Friedman, Cal. Practice Guide: Corporations (The Rutter Group 2013) ¶¶ 8:358, 8:365-8:366, pp. 8-65, 8-66.1.)

B. *The Set Aside Remedy*

The trial court sustained the demurrer to the second amended complaint without leave to amend, in part because it correctly determined that the minority shareholders of Panam Financial had no claim for monetary relief. They had their chance with that by way of appraisal. But the second amended complaint also seeks to set aside the buyout of Panam Financial by Bron et al., and an examination of the record reveals the minority shareholders have never given up that alternative request. To be sure, the trial judge pressed them to give it up. The judge understandably did not want to unscramble any eggs. Even so, counsel for the shareholders managed to bob, weave and duck around the trial judge's efforts, so in the end he did not waive the request for the alternative of a set aside.[20]

The reason the trial court sustained the demurrer to the entire second amended complaint, including its prayer of unwinding the merger, was that the trial court concluded the case wasn't a subdivision (b) common control case at all. So the question then becomes, where do we go from here? Because the trial court determined subdivision (b) actually didn't apply at all, the Bron group's briefing in this case has conspicuously avoided the question of whether the plaintiffs' remedy of set aside could be disposed of on demurrer. (Bron and friends have instead tried to hold the line on the issue of whether the Panam Financial buyout was a subdivision (b) common control situation at all.)

---

[20] Here are pertinent parts of the exchange:

"The court: . . . . Well, let me ask one question for you, Mr. Wissbroeker. In your prayer, my impression from reading the arguments was that nobody is looking to – I think your expression is, 'unscramble the egg.' So you're not looking to unwind the merger.

" [¶] . . . [¶]

"Mr. Wissbroeker: Well, your honor, the response is as follows. And I'm not trying to be cute, but we believe the appropriate remedy here is rescissory damages, which is obviously a monetary remedy.

"The court: Right.

"Mr. Wissbroeker: "If the court's conclusion is that there's no availability of rescissory damages, unwinding the merger would be the fallback, but I think we all agree it's probably difficult to do that at this point."

27

There is only so much a court can do on demurrer. As in *Kruss, supra*, 185 Cal.App.4th at page 727, this case may indeed involve valid defenses to the minority's effort to set aside the buyout. Questions arise that were not the focus of proceedings below, particularly centered on subdivision (b)'s requirements of "10 days' prior notice to the corporation" and the need to show "no other remedy will adequately protect the complaining shareholder." But those defenses need a much more factual record than we have on a demurrer. Concomitantly, we note subdivision (c) of section 1312 shifts, in common control situations, the burden of showing the buyout was just and reasonable. The burden-shifting situation further suggests the need for a factual record that is not possible on demurrer.[21]

We therefore decline the Bron group's invitation to dispose of the case on issues not considered by the trial court, such as the business judgment rule, or the nature of the proxy statement sent out in the course of the buyout vote. (Cf. *State Building & Construction Trades Council of California v. Duncan* (2008) 162 Cal.App.4th 289, 318, fn. 17 ["We decline to reach these issues because they have not been fully developed in the trial court papers or in the appellate briefs."].) All we determine here is that subdivision (b) does apply to the Panam Financial buyout and on this record the plaintiff minority shareholders have stated a cause of action to rescind that buyout, even if they have no claim for any monetary relief.

---

[21] Professor Marsh's treatise on corporate law opines that subdivision (c) simply codified existing California law as exemplified in *Efron v. Kalmanovitz* (1967) 249 Cal.App.2d 187. (See Marsh's Cal. Corporation Law § 19.09.) *Efron* was a shareholder derivative arising out of the sale of corporate assets on the cheap in a common control situation, and, significantly, noted that the unfairness of the transaction was a matter of *fact* for the trial court. (See *Efron, supra*, 249 Cal.App.2d at p. 191 ["The question as to whether the terms of payment fixed by the contract rendered the contract unfair was one of fact to be determined by the trial court and that court having determined that the contract was unfair this court cannot substitute its judgment for that of the trial court."].)

28

DISPOSITION

The judgment is affirmed to the extent it precludes the plaintiffs from seeking any damage remedy, including "rescissory damages." It is reversed to the extent it precludes on demurrer the plaintiffs from seeking to unwind the buyout of Panam Financial by Bron and friends. Beyond determining that the second amended complaint alleges a cause of action for unwinding of the buyout under subdivision (b) of section 1312, we express no opinion. This result is a split decision, so each side will bear its own costs on appeal.


BEDSWORTH, J.

WE CONCUR:


RYLAARSDAM, ACTING P. J.


MOORE, J.

29