[Civ. No. 922.    Fifth Dist.    Jan. 23, 1969.]

EDWARD A. JACKSON et al., Plaintiffs and Appellants, v. JOHN P. MAGUIRE et al., Defendants and Respondents.

Elke, Farella, Braun & Martel, Thomas Elke, Thomas, Snell, Jamison, Russell, Williamson & Asperger and Howard Thomas for Plaintiffs and Appellants.

Orrick, Dahlquist, Herrington & Sutcliffe, Mack, Bianco & Means and Dominic Bianco for Defendants and Respondents.

CONLEY, P. J.—Essentially this is an appeal by minority stockholders of a complex of corporations operating in the telephone communications business on behalf, generally, of all stockholders to secure, in two basic instances, additional consideration for their corporate interest. One major attempt deals with the alleged additional rights of former owners of stock of the Central California Telephone Company; the second claim is urged on behalf of stock owners in Central Western Company as against the directors and owners of the majority stock of the telephone company on the theory that such persons were paid more than a fair share of the assets of the major succeeding company of the complex for stock of a subsidiary company, entitled Medusa, wholly owned by them. While the evidence in certain of its aspects is multiform and complex, the reason for upholding the judgment in favor of the defendants is simplicity itself from the standpoint of this appellate court; the findings of the trial court based on substantial evidence are fatal to the contentions of the appellants. It is hornbook law that an appellate court cannot retry the case but is bound by the conclusions and findings of the trial judge if such findings are supported by substantial evidence. This is our holding with respect to the first issue outlined above, and it also applies to the second issue to the effect that what was paid to the Medusa stockholders was fair and proper.

In order to attain a firm grip on the issues presented, it is necessary for us to summarize within short compass the economic facts relative to the telephone business here involved.

Typical of many present business structures, the litigation discloses a telescoping of corporations, starting with an original simple organization actually conducting a telephone business in the western part of the United States, the Central California Telephone Company. Examining further, we then

come to a holding company named "Central Western Company" and a number of other subsidiary corporations performing various functions of the telephonic communications business. Finally, there was created a major organization backed by a large holding of money. Generally speaking, the plaintiffs are former owners of Central California Telephone Company stock, and the defendants are the final major corporation, Continental Telephone Company, and the individuals who, as majority stockholders of the various component companies, have occupied places on the boards of directors and whom the plaintiffs seek to hold responsible for what they claim was a failure in various details to treat the minority stockholders in a fair and equitable manner.

Initially, the stockholders and directors controlling the destinies of the communications complex, feeling that their organizations were not making the profits they were capable of earning, formed a plan to increase the grasp and income of this telescoping of telephone companies. In order to expand, it was decided that the holding company, Central Western Company, should purchase enough of the Central California Telephone Company stock to increase materially the dividends received from it by the Central Western Company. To effect this end, an offer was made to the stockholders of the Central California Telephone Company by the Central Western Company to pay $12.50 per share for each of their shares sold and delivered. This campaign to acquire stock was carried on through John B. Bailey, a broker, who had enjoyed the patronage and trade of many of the shareholders previously. In connection with the attempt of Mr. Bailey to purchase the Central California Telephone Company stock, the following letter was sent to the prospective sellers:

"October 18th, 1960

"Dear Sir:

"This is to advise you that Central Western Company, a holding and management company with investments in a number of telephone properties, is offering to purchase shares of the Common Stock ($10.00 par value) of Central California Telephone Company at a cash price of $12.50 per share. Central Western Company is presently the largest shareholder of Central California Telephone Company and is making this offer in anticipation of facilitating its future financing by increasing its percentage ownership of that company's stock.

"The offer is being made through us as agents of Central Western Company. Central Western Company will pay Bailey

& Co., 20 [cents] per share on Central California Telephone Company stock purchased by it pursuant to this offer.

"For your information, attached is a summary financial statement of Central California Telephone Company as at July 31, 1960. This includes a summary balance sheet as of that date and summary comparative profit and loss statements for the seven months' period ending July 31, 1960, and the years ending December 31, 1958 and 1959.

"It is anticipated that in view of the current earnings of Central California Telephone Company, the dividend rate will be increased commencing February 1, 1961 to not more than $0.90 per share. The continuation of such dividend rate will depend, of course, on the future earnings of Central California Telephone Company.

"This purchase offer is being made to all shareholders of Central California Telephone Company, provided, however, that Central Western shall not be obligated to purchase in excess of 17,000 shares of Central California Telephone Company, tendered to it in response to this offer.

"Stockholders who accept this offer will receive the November 1st quarterly dividend of 15 [cents] per share.

"If you accept this offer, we would appreciate your completing and returning to us immediately the enclosed letter and properly endorsed certificate by registered mail.

"Yours truly,<br>
s/ John B. Bailey"

The prospective purchasers were asked to use the following letter form in tendering the stock owned by them at the price mentioned:

"Bailey & Co.
2303 Fresno Street
Fresno 21, California

"Gentlemen:

"I accept the offer made by Central Western Company to purchase my shares of the common stock of Central California Telephone Company now standing in my name at $12.50 per share.

"You will find enclosed the certificate for these shares properly endorsed with my signature guaranteed by a bank.

"I acknowledge receipt of the seven months' unaudited balance sheet of Central California Telephone Company as of July 31, 1960 and income statements of that company for the

seven months ended July 31, 1960 and the years ended December 31, 1958 and 1959.

"It is my understanding that you will remit by check to me promptly upon receipt of the enclosed certificate, unless the 17,000 share limit stated in your letter has been reached and Central Western Company does not wish to purchase any additional shares, in which event, the enclosed certificate will be promptly returned to me.

"Very truly yours,

_____"

It is the contention of the plaintiffs that the minority shareholders were not treated fairly, because, in some instances, they were given to understand that the purchaser of their stock, the Central Western Company, would later issue stock of its own which would be made available to the sellers. This original plan was later set aside for what appeared to the company to be good reasons. At that later time, a letter was sent by direction of Mr. Bailey to those who had sold stock of the Central California Telephone Company in the following terms:

"At or about the time we were offering to purchase the common shares of Central California Telephone Company at the price of $12.50 per share, we were giving consideration to a public offering of Central Western Company's common shares. However, for various business reasons which we consider to be compelling, it has been determined to postpone any public offering of Central Western Company common shares indefinitely. We have heard, directly or indirectly, from a few persons who sold to this company their shares of Central California Telephone Company that they did so in the hope and expectation that they would be afforded an opportunity to purchase common shares of Central Western Company.

"Since no such offering will be available within the reasonably foreseeable future, we are advising such persons who sold their Central California Telephone Company shares that we would be willing to reverse the transaction and deliver such shares to them for the price which we paid, namely, $12.50, less the sum of $0.15 per share, which $0.15 per share is equal to the dividend declared and paid on Central California Telephone Company shares since they sold those shares. In short, we are offering to make them whole, if they desire to repurchase their shares.

"In all fairness, we wish to treat all of the selling share-

holders of Central California Telephone Company shares equally. Accordingly, we hereby tender you the opportunity to repurchase your shares of Central California Telephone Company at the price of $12.50, less the sum of $0.15 per share, which $0.15 per share is equivalent to the dividend recently paid on Central California Telephone Company common shares. Our records show that you sold to us ———————— shares of Central California Telephone Company common stock.

''The offer hereby made will be open for acceptance only up to the 22nd day of March, 1961. If you elect to accept this offer, your check, payable to the order of Central Western Company, in the sum equal to $12.35 for each share you wish to repurchase must either be in the hands of this company, or deposited in the mail, addressed to this company, on or before the close of business on said 22nd day of March, 1961. In the event you do not so elect to repurchase the shares within the time above stated, we will deem that you have determined to ratify the sale and to retain the purchase price you received rather than elect to repurchase the shares you sold.

''Very truly yours,

''CENTRAL WESTERN COMPANY

''By /s/ J. P. Maguire

J. P. Maguire, President.''

It should be noted in this connection that it has not been, and is not now, the position of the appellants in the case that an additional term for the sale of the Central California Telephone Company stock was an undertaking that later stock of the Central Western Company would be issued and would be made available to those who had sold Central California Telephone Company stock to the Central Western Company. The appellants do not rely upon any claimed fraudulent representations of the defendants, that is to say, the majority shareholders or the members of the several boards of directors with respect either to the existence of fraud or of specific promises of additional consideration. Fraud is not alleged or claimed; neither is it asserted that the defendants promised as additional consideration for the purchase of the stock that there would be issued, in due course, available stock of Central Western Company for those who had sold their Central California Telephone Company stock. The contention is made otherwise, namely, that there was a duty on the part of the defendants at the time of the solicitation of purchase of their

Central California Telephone Company stock to give more information concerning plans for the future steps to be taken in refinancing the entire complex of corporate organizations, or that when such plans were changed, after the purchase of the stock by Central Western Company by the merger of Central Western Company and Continental Telephone Company, the defendants then owed the duty to tell the people who had sold their stock of a change of the plans.

However, common sense and the experience of people in the business world make it clear that once stock is sold and transferred the majority owners of the stock of the corporation involved, who are also members of the boards of directors, no longer owe any continuing future fiduciary or other duty to the shareholders whose interests have been purchased *unless* there has been fraud or *unless* there has been a promise on the part of the purchasers to furnish additional consideration. Neither of these situations is presented by the record here.

Dependence is placed by the appellants on the general rule that one who occupies a fiduciary position in a corporation owes a fiduciary duty of fair disclosure to the minority of stockholders of that organization. (*Remillard Brick Co.* v. *Remillard-Dandini Co.*, 109 Cal.App.2d 405 [241 P.2d 66]; *Burt* v. *Irvine Co.*, 237 Cal.App.2d 828 [47 Cal.Rptr. 392]; *Southern Pac. Co.* v. *Bogert*, 250 U.S. 483 [63 L.Ed. 1099, 39 S.Ct. 533].) And under the "special facts doctrine" it is claimed that the defendants owed a duty to give more specific facts of the corporate plans to plaintiffs. (*Hobart* v. *Hobart Estate Co.*, 26 Cal.2d 412 [159 P.2d 958]; *Stevens* v. *Marco,* 147 Cal.App.2d 357 [305 P.2d 669]; *Low* v. *Wheeler*, 207 Cal.App.2d 477 [25 Cal.Rptr. 538].) However, there is no rule that after the acquisition of stock by a purchaser the corporation which has bought the stock owes any duty to advise those who have fairly sold their shares of a change of plan for financing the corporation involved.

The gap in this case, if there is one, is filled by the findings of the trial court. Paragraphs XLIII and XLIV of the findings of fact are as follows:

## "XLIII

"At the time that Central Western employed Bailey & Co. to purchase said stock, as aforesaid, and before Bailey & Co. undertook to negotiate the purchase of any of said shares of stock of Central California for Central Western, Central Western instructed Bailey & Co. that in the negotiation for and the

purchase of said shares of stock Bailey & Co. was not to make any representations to any shareholder of Central California to the effect that part of the consideration for the sale by such shareholder of stock in Central California to Central Western was to consist of a right of first refusal on the part of such shareholder to purchase any future offering of shares of stock of Central Western, nor to represent to any such selling shareholder that such selling shareholder would be able to obtain any newly issued stock of Central Western as a matter of right, nor to make any statement or representation that a condition of the issuance of any stock of Central Western to the public was the acquisition by Central Western of any additional share of Central California stock.

## "XLIV

"Neither John B. Bailey nor Bailey & Co. violated the instructions of Central Western and neither of them made any misrepresentation of fact in the purchase of any shares of stock from the former shareholders of Central California for Central Western."

Further findings of fact are as follows:

## "LI

"Between the 1st day of September, 1960, and the 31st day of December, 1960, Central Western purchased from 105 separate individuals and entities a total of 16,799 shares of the capital common stock of Central California for the price of $12.50 per share, which said $12.50 per share was the fair and reasonable market value of said shares of stock at each and all of the times that it was purchased.

## "LII

"After the 31st day of December, 1960, and before the 7th day of March, 1961, Central Western received information that some of said 105 separate individuals or entities and former shareholders of Central California who had sold their stock during the said period of time to Central Western might have done so in the hope and expectation that they would be offered an opportunity to purchase shares of stock of Central Western, which Central Western, before December 31, 1960, proposed to offer to the public pursuant to Regulation 'A' of the Securities & Exchange Commission of the United States of America. On the 7th day of March, 1961, on advice of counsel, Central Western mailed to each and all of said former share-

128

holders of Central California who had sold the said 16,799 shares of Central California aforesaid, the letter, a true and correct copy of which is annexed as Exhibit 'A' to the First Amended Complaint on file herein. Each of said former shareholders received said letter, Exhibit 'A', in sufficient time to have accepted said offer, to wit, on or before the 22d day of March, 1961, save and except Ralph G. Houston, who received said letter on the 23d day of March, 1961. Each and all of said letters were addressed to said shareholders by registered mail, postage prepaid, return receipt requested.

## "LIII

"Twenty of such former shareholders who had sold their stock as aforesaid, elected to accept the offer contained in said Exhibit 'A' to repurchase from Central Western, in accordance with the terms thereof, a total of 3,159 shares of the common stock of Central California. Said 20 shareholders totaling the total shares as aforesaid, were the only ones who made any election to accept such offer. None of the other former shareholders who had sold any part of said 16,799 shares was at any time refused the opportunity to repurchase his, her, their or its shares of stock, which had been previously sold as aforesaid. Ralph G. Houston has never at any time made any demand on, or offer to repurchase from, Central Western any of the shares of stock of Central California previously sold by him to Central Western.

## "LIV

"Each and all of said former shareholders of Central California who had sold said 16,799 shares of Central California to Central Western as aforesaid, from and after the 23d day of August, 1961, knew that Central Western and TCC were contemplating the said merger which was consummated on the 29th day of September, 1961, and knew that as a part and parcel of said merger TCC would issue to the shareholders of the common stock of Central Western 275,250 shares of its common stock in exchange for 91,750 shares of the common stock of Central Western."

We, thus, have a record which shows that the full reasonable market value of the stock was paid for; that there were no promises for an additional consideration for the stock and that no fraud of any kind was involved in the sale. In these circumstances, backed as the findings are by substantial evidence, although to some extent conflicting, the judgment in favor of the defendants on the first ground claimed by them cannot be affected or reversed.

Turning to the second count, we find a complaint by some of the shareholders of Central Western Company that the owners of all of the stock of the Medusa Corporation, a subsidiary in the telephone business, got more than they should have been allowed by the Continental Telephone Company. We do not discover that there is any element which would run counter to the findings of fact. The Medusa shareholders did not have to sell; they were apparently perfectly willing to hold the stock, which gave them the ownership and conduct of the Medusa Company, and it was of advantage, apparently, to Continental Telephone Company to acquire the outstanding stock.

The findings of the court on this second attempt to recover judgment by the plaintiffs are in favor of the defendants, and substantial evidence in the case supports such findings, even though there are factors which, in the discretion of the finder of facts, conceivably might have led to conclusions the other way. The trial court holds as follows as to this second contention: "None of the allegations of paragraph XVI of the fourth cause of action contained in the Amended Complaint on file herein is true, and the court finds that there was a full, fair and complete disclosure of all of the terms, conditions and provisions of the merger between TCC and Central Western and the exchange of 63,000 shares of TCC for the said 1,000 shares of Medusa, to each and all of the shareholders of Central Western, Medusa, The Western Telephone Company, a California corporation, a subsidiary of Central Western, and Central California, and in addition, to all former shareholders of The Western Telephone Company and Central California whose shares were purchased by brokers pursuant to instructions of Central Western from and after June 30, 1959, and to the Commissioner of Corporations of the State of California; said Commissioner of Corporations, after an extensive hearing, of which all of said shareholders and former shareholders of said corporations had not less than ten days prior written notice, made his findings of fact and conclusions that said merger and exchange was fair, just and equitable.

"The court finds that Medusa was incorporated November 19, 1954, two years and five months before the incorporation of Central Western. Medusa leased vehicles and other equipment to other entities before the formation of Central Western and was a going business at the time Central Western was formed. After Central Western was formed, Medusa leased

vehicles and other equipment to Central Western, its subsidiaries and other nonconnected enterprises. In recent times the majority of the business of Medusa was with Central Western and its subsidiaries. Medusa provided a legitimate service that had distinct advantages when compared with the alternative of these companies having to purchase this equipment for themselves. The rates charged by Medusa to Central Western and its operating subsidiaries were competitive with other leasing companies in the area. The service provided by Medusa was not in competition with the business conducted by Central Western and its operating subsidiaries. The defendants did not wrongfully use their powers to the prejudice of Central Western, its operating subsidiaries or their shareholders.

"The court has not reviewed the relative values of the Medusa and TCC exchange and makes no finding of fact with reference to the relative values.

## "XXXVII

"No suit or action of any kind has ever been filed in any court of the State of California or in any federal court of the United States of America having jurisdiction thereof by any shareholder of Central Western for the purpose of testing whether the number of shares required by law to authorize or approve the merger between TCC and Central Western was voted in favor of the merger by the persons legally entitled to vote thereon.

## "XXXVIII

"None of the shareholders of Central Western who voted against the merger between TCC and Central Western at the special meeting of shareholders of Central Western on July 17, 1961, nor any transferee of any such shareholder, has ever made any demand at any time upon Central Western to purchase from him, her or them his, her or their shares of stock in Central Western upon payment of the fair market value thereof.

## "XXXIX

"No suit or action has ever been filed in any court of the State of California or in any federal court of the United States of America having jurisdiction thereof by any shareholder of Central Western for the purpose of obtaining a determination that any shares of stock of Central Western were dissenting shares on the merger between TCC and Cen-

tral Western at the special meeting of the shareholders of Central Western held July 17, 1961, or for the purpose of determining the fair market value of any such shares of stock of Central Western, or for an appraisal thereof.''

It should be observed further that if there existed any right to bring suit arising out of the Medusa transaction the right to sue would inhere in Central Western, the corporation itself, and not in any grouping of shareholders of that organization in the absence, at least, of an attempt by certain shareholders to secure action by the corporation. (*Anderson* v. *Derrick,* 220 Cal. 770 [32 P.2d 1078]; *O'Hare* v. *Marine Elec. Co.,* 229 Cal.App.2d 33 [39 Cal.Rptr. 799].)

Attention should be called in passing to the fact that section 4123 of the Corporations Code provides that after a merger has been approved by the requisite number of its shareholders, as is true in this case, no shareholder has any right to attack the validity of the merger or to have it set aside or to rescind it ''except in an action to test whether the number of shares required by statute to authorize or approve the merger or consolidation have been voted in favor thereof by persons legally entitled to vote them. . . .'' The section further provides that any shareholder is entitled to payment in accordance with the provisions specifically made in the merger agreement, and dissenting shareholders are entitled to action for the fair market value of their shares after complying with the provisions of sections 4300 to 4318 of the Corporations Code. The remedy provided by these sections is exclusive. (*Giannini Controls Corp.* v. *Superior Court,* 240 Cal.App.2d 142 [49 Cal.Rptr. 643]; 1 Ballantine & Sterling, California Corporation Laws (4th ed.) § 336.)

Finding no reversible error in the record and for the reasons hereinbefore stated, the judgment is affirmed.

Gargano, J., concurred.

Stone, J., deeming himself disqualified, did not participate.

A petition for a rehearing was denied February 18, 1969. Stone, J., did not participate therein. Appellants' petition for a hearing by the Supreme Court was denied April 17, 1969.