Filed 9/8/22 IQ Holdings v. Krablin CA2/6

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SIX

| | |
|---|---|
| IQ HOLDINGS, INC., <br><br>   Plaintiff, Cross-Defendant and Appellant, <br><br> v. <br><br> JOHN R. KRABLIN et al., <br><br>   Defendants, Cross-Complainants and Respondents. | 2d Civ. No. B307034 <br> (Super. Ct. No. 17CV04706) <br> (Santa Barbara County) |

John R. Krablin (Krablin), a general contractor, and his company, Krablin Enterprises, LLC, performed construction and design work on a renovation project for IQ Holdings, Inc. (IQ). Dissatisfied with Krablin's expense accountings, IQ sued him for damages. Krablin cross-complained.

Following a six-day bench trial, the court concluded it was "essentially a case . . . of complete failure to communicate" and denied all requested relief. Among other things, the court found the testimony of Pradeep Yohanne Gupta (Gupta), IQ's chief

executive officer, was at times "significantly lacking in credibility" and "internally inconsistent," and also rejected IQ's expert witness testimony as not "adequately complete or reliable." The court acknowledged that Krablin's final accounting was "not perfect," but determined it was "adequate" and that "no additional sums are due to be paid" to either party.

IQ contends "the trial court misapplied the law to the undisputed facts" and asks us to engage in de novo review. The purpose of the trial, however, was to resolve the many factual disputes. We agree with Krablin that substantial evidence supports the court's resolution of those disputes and affirm on that basis.

Krablin has filed two motions seeking monetary sanctions against IQ and/or its attorneys for (1) submitting an inadequate appellant's appendix and (2) pursuing a frivolous appeal. We grant the first motion and order IQ's attorneys to pay Krablin $15,050 to compensate him for the attorney fees incurred to obtain the corrected appendix. With some reluctance, we deny the second motion.

FACTUAL AND PROCEDURAL BACKGROUND

In 2015, Krablin and Gupta, who were neighbors and friends, began discussing Krablin's possible renovation of a residential property owned by IQ in Montecito.[1] It consisted of a main residence and several outbuildings, including a garage that Gupta wanted remodeled to include guest accommodations. Krablin advised Gupta of his significant experience as a general contractor and was confident he could manage the project in a cost-efficient manner.

---

[1] The property is known as the "Scarface" house because the 1983 movie was filmed there.

IQ is a family-owned, Texas-based holding company that manufactures and distributes consumer products to big-box retailers; owns other companies, including a private equity investment bank; and holds a substantial number of investment properties. It is particularly known for bringing WD-40 to market. As the trial court observed, IQ "is a sizable firm with significant real estate holdings, and Gupta has significant experience in real estate development and construction, managing a portfolio worth many millions of dollars. IQ . . . has a professional staff dealing with all aspects of construction and property management, with an accounting department. The nature and extent of Krablin's business [are] entirely different. Krablin worked almost exclusively on residential projects, including some high-end projects. It was not unusual for Krablin to have several projects going at the same time. Krablin handled his own project accounting, with some help from his wife, a banking executive."

IQ and Krablin did not enter into a written contract. Gupta and Krablin orally agreed that Krablin would construct the items identified by Gupta on a cost-plus-15-percent basis, "and not much beyond that is certain at all." They did agree that IQ would advance money for the construction and that Krablin would account for the expenditures. Gupta gave Krablin oral instructions regarding the work he wanted done. Gupta regularly visited the construction site, discussed the ongoing work with Krablin and provided him with additional funds as needed. As the trial court noted, "[t]his was a pet project for Gupta, that he took on himself, although he had access to professional administrative support, and even his own construction teams with the necessary trades to do the work."

3

Gupta initially was happy with Krablin's work. After Krablin provided his April 2016 expense report, Gupta began asking for backup receipts documenting the expenditures in Krablin's monthly expense reports. Krablin explained that providing receipts is a time-consuming task which he could not do while physically working each day.

Nonetheless, in May or June 2016, at Gupta's insistence, Krablin provided a file box containing the job file, contracts and receipts to back up his expense reports. The contents of the box were loose and unorganized. Gupta assured Krablin that his "fellows" in Texas would organize the documents.

Gupta asked IQ's in-house accountant, Raaj Ajmeri (Ajmeri), to assist with the accounting. Ajmeri sorted through the documents, viewing "them in light of various [expense] reports provided by Krablin," but "could not balance the books." After discovering a $15,000 expense belonging to another Krablin project, a mistake Krablin readily admitted, IQ and Gupta began to view Krablin "as some sort of confidence man rather than a contractor who is rather incompetent in his accounting."

Despite the accounting issues, the work on the project continued and was completed by August 2016. According to Krablin, he was never able to give IQ the accounting information in a format that Gupta and Ajmeri found acceptable. IQ, "for its part[,] sought a degree of detail that was not possible for Krablin to produce, and endeavored to seek for every error, and attribute each one to intentional malfeasance rather than ineptitude."

IQ's first amended complaint (FAC) alleged causes of action for breach of contract, breach of the implied covenant of good faith and fair dealing, conversion, negligent misrepresentation, unfair business practices, unjust enrichment and an accounting.

4

Krablin's cross-complaint sought $3,091.36, which he claimed he was still owed for the project.

The trial was conducted in two phases. During the first phase, the trial court rejected IQ's assertion that because Krablin was unlicensed for a short period of time during the latter part of the project, he must disgorge all monies paid to him. (See Bus. & Prof. Code, § 7031, subd. (b).)[2] The court found that Krablin had substantially complied with the licensing statute in good faith and thus was not required to disgorge the cost of the project.

In the second phase, IQ sought to recover one-third of the $700,550 paid for the project. The trial court ruled against IQ on each of its causes of action. It disagreed that there was "an utter absence of support" for Krablin's final accounting and found the requested "1/3 reduction to be arbitrary." The court also entered judgment against Krablin on his cross-complaint, finding IQ "did pay what it owed for the work [Krablin] performed."

## I. DISCUSSION

### A. Standard of Review

"In reviewing a judgment based upon a statement of decision following a bench trial, we review questions of law de novo. [Citation.] We apply a substantial evidence standard of review to the trial court's findings of fact. [Citation.] Under this deferential standard of review, findings of fact are liberally construed to support the judgment and we consider the evidence in the light most favorable to the prevailing party, drawing all reasonable inferences in support of the findings." (*Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 981; see *Fladeboe v. American Isuzu Motors Inc.* (2007) 150 Cal.App.4th 42, 59-60.) We do "not

---

[2] All statutory references are to the Business and Professions Code unless otherwise stated.

5

reweigh the evidence, evaluate the credibility of witnesses or indulge in inferences contrary to the findings of the trial court. [Citations.] The substantial evidence standard of review is generally considered the most difficult standard of review to meet, as it should be, because it is not the function of the reviewing court to determine the facts." (*In re Michael G.* (2012) 203 Cal.App.4th 580, 589.)

*B. Substantial Evidence Supports the*
*Trial Court's Factual Findings*

Most of IQ's arguments fail because they are based on the erroneous premise that the facts in this case are undisputed. In IQ's view, the trial court erred by failing to view the evidence in I.Q.'s favor. For example, IQ argues that the testimony of its construction accounting expert, Raquel Christiansen, requires that Krablin refund $552,000 of the project cost. The court, however, discredited Christiansen's testimony because she never visited the job site and had only identified costs that were "'disputable'" based on her review of the documentation. Noting that "disputable does not necessarily mean wrong," the court concluded Christiansen's testimony was not "adequately complete or reliable."

Our function as an appellate court is not to retry the case or reweigh the evidence. The justification for the substantial evidence rule is that the trial judge, having heard the evidence, observed the witnesses, their demeanor, attitude, candor, or lack of candor, is best qualified to pass upon and determine the factual issues presented by their testimony. (See *Jackson v. Maguire* (1969) 269 Cal.App.2d 120, 121 (*Jackson*) ["It is hornbook law that an appellate court cannot retry the case but is bound by the conclusions and findings of the trial judge if such findings are supported by substantial evidence"].)

6

### 1. Breach of Contract/Breach of Fiduciary Duty

IQ's claims are based on Krablin's alleged failure to provide an adequate or acceptable accounting of the project's expenditures. IQ has no complaints regarding the quality of the design and construction. It maintains that an accounting is an "exact science," that Krablin had a contractual and/or fiduciary duty to provide an exact accounting and that it was damaged by his failure to do so.

IQ incorrectly states that the trial court did not find the existence of a contract between the parties. It found "[t]he contract was so devoid of specificity that one can only conclude that each party acted fairly and in good faith as they saw it." Among other things, the contract did not address "[t]he many details covered by ordinary construction contracts such as scope of work, contract price, insurance, safety issues, management of subcontractors, liens, accounting and payments – and so very much more."

In any event, a claim for breach of contract requires proof of damages. (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 821; see Civ. Code, § 3301.) Each accounting provided by Krablin, as he attempted to meet IQ's demands, varied only in the amount IQ owed Krablin, above and beyond the amount already paid. IQ did not present its own accounting showing that it was overcharged for labor or materials. To the contrary, Gupta conceded at trial that IQ's claim for reimbursement of one-third of the total amount paid was "arbitrary." In addition, as discussed above, the trial court disregarded Christiansen's expert testimony as not "adequately complete or reliable."

IQ's FAC does not include a claim for breach of fiduciary duty. Nor does it allege an implied-in-fact contract requiring Krablin to produce receipts supporting his expenditures. ""As a

7

general rule, theories not raised in the trial court cannot be asserted for the first time on appeal; appealing parties must adhere to the theory (or theories) on which their cases were tried.”’” (*American Indian Health & Services Corp. v. Kent* (2018) 24 Cal.App.5th 772, 789.)  We decline to consider these issues for the first time on appeal.  (See *Zimmerman, Rosenfeld, Gersh & Leeds LLP v. Larson* (2005) 131 Cal.App.4th 1466, 1488; *Piscitelli v. Friedenberg* (2001) 87 Cal.App.4th 953, 983.)

## 2. Unlawful Business Practices

IQ contends Krablin violated sections 7108 and 7111, which are part of the Contractors State License Law (§ 7000 et seq.; CSLL).  These statutes generally impose recordkeeping duties on licensed contractors and allow for disciplinary action by the Contractors State Licensing Board (CSLB) for any violations.  Section 7108 requires a licensed contractor to “substantially account” for the application or use of funds provided for construction projects.  Here, the trial court found Krablin’s accountings to be “imperfect” but “adequate.”  As previously noted, substantial evidence supports this finding.

## 3. Accounting

IQ contends the trial court erred by rejecting his accounting cause of action and requests that the matter be remanded for “an accounting . . . to determine how much of IQ Holdings’ advanced payments were unsubstantiated and ‘wrongly obtained’” by Krablin.

An action for an accounting is a “‘means of discovery’” that “is consistent with the idea that a plaintiff seeking an accounting cannot ‘allege[] the right to recover a sum certain’ because [it] lacks the information necessary to determine the precise amount that may be due.” (*Sass v. Cohen* (2020) 10 Cal.5th 861, 869.)  An accounting is not due, however, when all the information is

8

produced and offered to the trial court for adjudication of the parties' competing claims.

In *Winegar v. Gray* (1962) 204 Cal.App.2d 303, the court rejected the plaintiff's assertion that he was entitled to an accounting. His claim was based on the alleged inadequacy of the defendant's records. But, as in this case, the alleged inadequacies were offered into evidence and adjudicated by the trial court. (*Id.* at p. 315.) Having found that no monies were due either party, the court appropriately denied the accounting claim. (See *ibid.*) The same is true in this case.

### 4. *Negligent Misrepresentation*

IQ asserts Krablin is liable in tort because he represented that he would accurately account for his project expenditures, "when he knew that this was false." The trial court denied this claim, noting that "the parties said many things to each other. Both of them said things that were not true, to each other's bewilderment. Which of these might be negligent misrepresentations could not be ascertained, in considering the veracity of both Defendant and Plaintiff."

The trial court found that Gupta's "lengthy" testimony "was internally inconsistent in a variety of ways." Among other things, the court did not believe his claim that "90% of his very large business is conducted without written contracts or other such documentation." It also "was apparent to the court that [Gupta] was most troubled because he felt disrespected, that he had not received the kind of attention and communication that he was accustomed to receiving in the world of his IQ Holdings, Inc. business. He undertook the matter as a loose and undefined pet project, and found that . . . Krablin and his [company] did not conduct business in the way he anticipated."

9

IQ does not attempt to show that the trial court's findings are unsupported by substantial evidence. Instead, it provides its own assessment of the evidence and the parties' credibility and asks us to adopt its view of the facts. As previously discussed, we may not reweigh the evidence, evaluate the credibility of witnesses or indulge in inferences contrary to the trial court's findings. (*In re Michael G.*, *supra*, 203 Cal.App.4th at p. 589.)

### 5. *Claim for Disgorgement Under Section 7031, Subdivision (b)*

Section 7031, subdivision (a) of the CSLL provides that no person "engaged in the business or acting in the capacity of a contractor" can bring an action for compensation for work requiring a contractor's license if the person was not properly licensed at all times during the performance of the work. Subdivision (b) goes further, permitting a person "who utilizes the services of an unlicensed contractor" to bring an action for disgorgement of "all compensation paid to the unlicensed contractor."

Section 7031, subdivision (e) offers contractors a "safe harbor" from the disgorgement provision: "[N]otwithstanding subdivision (b) of Section 143, the court may determine that there has been substantial compliance with licensure requirements under this section if it is shown at an evidentiary hearing that the person who engaged in the business or acted in the capacity of a contractor (1) had been duly licensed as a contractor in this state prior to the performance of the act or contract, (2) acted reasonably and in good faith to maintain proper licensure, and (3) acted promptly and in good faith to remedy the failure to comply with the licensure requirements upon learning of the failure."

Application of the safe harbor exception is a question of fact. (See *ICF Kaiser Engineers, Inc. v. Superior Court* (1999) 75

10

Cal.App.4th 226, 236.) During the first phase of trial, the court found that Krablin "substantially complied with the licensure requirements . . . and was therefore duly licensed as a contractor at all times during his performance of the contract with [IQ]."

The doctrine of substantial compliance applies only if all three requirements of section 7031, subdivision (e) are met. (*WSS Industrial Construction, Inc. v. Great West Contractors, Inc.* (2008) 162 Cal.App.4th 581, 588-589.) IQ argues that Krablin failed to meet the second prong because he did not act reasonably and in good faith to maintain proper licensure. Krablin claims substantial evidence supports the trial court's finding on this issue. We agree with Krablin.

Krablin testified that he has been a licensed general contractor since 1988. He began the IQ project in November 2015 and completed most of it by August 2016. It is undisputed that he was licensed when he began the job and that his license expired on June 30, 2016. Krablin did not learn of the expiration until early September 2016, when he received a notice in the mail from the CSLB informing him that his license had expired and providing instructions for requesting license renewal.

Krablin immediately contacted the CSLB to confirm the renewal process. As part of that process, Krablin sent a letter of explanation to the CSLB in which he stated, in part: "I was completely unaware that I had not renewed my license and I apologize for this. I have always renewed promptly when I received the renewal in the mail, but I just honestly did not see it at my home/office." The CSLB accepted Krablin's request for a delinquent renewal and restored his license on September 15, 2016.

The trial court found that Krablin acted promptly and reasonably in reinstating his license immediately upon being

11

notified that his license had lapsed for non-payment due to his own administrative error. Once again, IQ second-guesses the court's factual finding, arguing that Krablin knew his license expired every two years on June 30 and should have had some sort of "tickler" system to remind him to renew. Even if the trial court could have made that finding based on the evidence, we do not second-guess the trial court's resolution of conflicting substantial evidence. (See *Kunec v. Brea Redevelopment Agency* (1997) 55 Cal.App.4th 511, 518.)

### C. Krablin's Motions for Monetary Sanctions on Appeal

#### 1. First Motion for Sanctions

On June 29, 2021, we dismissed IQ's appeal for failure to file an opening brief. We subsequently granted IQ's motion to vacate the dismissal, conditioned upon its filing the appellant's appendix and opening brief within five days.

On September 2, 2021, Krablin moved to strike IQ's 10-volume digital appellant's appendix for its failure to comply with the Rules of Court. Krablin also moved to dismiss the appeal and requested $15,050 in sanctions against IQ's counsel. (Cal. Rules of Ct., rule 8.124(g);[3] see *Ellis v. Toshiba America Information Systems, Inc.* (2013) 218 Cal.App.4th 853, 877 (*Ellis*) [sanctions to compensate respondent for successfully moving to strike a portion of appellant's appendix].)

IQ opposed the motion, but acknowledged its appendix failed to comply with rules 8.124(b)(1)(A) and 8.122(b)(1) and sought leave of court to correct the errors. Although the 10-volume appendix was 2,600 pages in length, it did not include the judgment, operative complaint, register of actions and 14 other necessary documents. The appendix was comprised mainly of

---

[3] All rule references are to the California Rules of Court.

trial exhibits, many of which were not discussed in IQ's opening brief or relevant to resolution of the issues on appeal.

Agreeing the appellant's appendix did not comply with the court rules, we ordered it stricken and gave IQ five days to serve and file a corrected appendix. IQ complied with this order. We denied the motion to dismiss the appeal but advised the parties that "[t]he court is considering granting [Krablin's] request for sanctions" and that "[o]ral argument on the issue of sanctions will be combined with oral argument on the merits of the appeal." (Rules 8.276(c), 8.124(g), 8.276(e).)

Rule 8.124(g), which is titled "Inaccurate or noncomplying appendix," states: "Filing an appendix constitutes a representation that the appendix consists of accurate copies of documents in the superior court file. The reviewing court may impose monetary or other sanctions for filing an appendix that contains inaccurate copies or otherwise violates this rule." (Bold omitted; see *Ellis*, *supra*, 218 Cal.App.4th at p. 877.) IQ does not dispute that it was responsible for providing an accurate appellant's appendix, and that it failed to do so. IQ ultimately corrected the appendix, but that correction required prompting by both Krablin and this Court.

Krablin seeks $15,050 in sanctions against IQ's counsel, representing 30 hours of work by his attorney, Herb Fox, at $500 per hour. After discovering the "substantial defects" in the appellant's appendix, Fox requested the sanctions to compensate his client for the fees incurred for Fox to "assess the inadequacies [in the appendix]; draft a letter to opposing counsel warning of a motion for sanctions unless the appendix was withdrawn and the appeal dismissed, and draft[] this motion for sanctions."

IQ argues that the sanction request is "excessive." We disagree. We conclude Krablin is entitled to monetary sanctions

13

against IQ's counsel in the amount of $15,050 to compensate him for the fees incurred to obtain a corrected appendix. (See *Ellis, supra*, 218 Cal.App.4th at p. 877.) But for counsel's negligence in preparing the appendix, the fees would have been unnecessary. Krablin should not have to bear that cost.

### 2. *Second Motion for Sanctions*

On February 10, 2022, Krablin filed his second motion for sanctions, this time against IQ and its attorneys. Krablin requests $41,500, in addition to the $15,050 previously requested, to compensate him for having to respond to appellant's "frivolous appeal," which he claims "violates various Rules of Court and standards of appellate practice." He argues that sanctions against IQ and its attorneys are appropriate based on their "prosecution of a frivolous appeal that no reasonable attorney would have pursued, and for violating a host of other rules, including the obligation of an attorney to not knowingly mislead a court as to the facts of a case and to present a full and fair rendition of the trial court proceedings."

On June 30, 2022, we notified IQ and its attorneys, pursuant to rules 8.276(a)(1), 8.276(a)(4) and 8.276(c), that we were considering granting Krablin's second motion for sanctions and gave IQ and its attorneys 10 days in which to respond to Krablin's motion. (Rule 8.276(d).) We further advised that the issue of sanctions will be heard in conjunction with the oral argument on the merits and the first motion for sanctions, scheduled for July 13, 2022, at 1:30 p.m. (Rule 8.276(e).)

In deciding whether to award sanctions for prosecuting a frivolous appeal, we consider the issue both objectively ("'whether any reasonable person would agree that the point is totally and completely devoid of merit, and, therefore frivolous'") and subjectively ("the motives of the appellant and his or her

14

counsel"). (*In re Marriage of Flaherty* (1982) 31 Cal.3d 637, 649-650 (*Flaherty*).) In exercising our discretion, we are mindful that the line between a frivolous appeal and one that is merely meritless is often vague, and that we must proceed carefully to avoid chilling the right to appeal. (*Id.* at p. 650.) Accordingly, sanctions for frivolous appeals should not be used "'in all but the clearest cases.'" (*Ibid.*)

*Flaherty's* objective element is satisfied here. IQ asserts a standard of review that would apply in a summary judgment proceeding but is plainly wrong in an appeal following trial. If the facts were undisputed, as IQ claims, there would have been no need for a six-day trial in which the court resolved numerous factual disputes.

Much as we are troubled by IQ's unsupportable arguments, we assume that counsel's motive was their misguided view that they were providing vigorous advocacy. In its reply brief, IQ acknowledged Krablin's argument that "liability and damages depend entirely on factual and credibility issues that were resolved by the trial court," but reiterated its view that we "can decide the issues on this appeal without weighing conflicting evidence or testimony." IQ fails to appreciate that, as an appellate court, we are "bound by the conclusions and findings of the trial judge if such findings are supported by substantial evidence." (*Jackson*, *supra*, 269 Cal.App.2d at p. 121.)

We do not find the presence of *Flaherty's* subjective element and accordingly discharge the order to show cause without imposition of sanctions. The issuance of that order, however, should warn IQ's counsel that another court may interpret adherence to a baseless position as a deliberate misrepresentation of the law, constituting bad faith under *Flaherty*.

15

## DISPOSITION

The judgment is affirmed. Respondents shall recover their costs on appeal.

Respondents' first motion for sanctions, filed September 2, 2021, is granted. Appellant's counsel of record are ordered to pay respondents sanctions in the amount of $15,050 within 15 days after the remittitur issues in this appeal.

Respondents' second motion for sanctions, filed February 10, 2022, is denied.

Upon issuance of the remittitur, the Clerk of this Court shall send a copy of this opinion to the California State Bar to report that judicial sanctions were imposed against appellant's counsel, Steven A. Blum (State Bar No. 133208) and Gary Ho (State Bar No. 229995). (§ 6086.7, subd. (a)(3); Rule 10.1017.)

NOT TO BE PUBLISHED.


PERREN, J.*

We concur:


GILBERT, P.J.


YEGAN, J.

---

* Retired Associate Justice of the Court of Appeal, Second Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Colleen K. Sterne, Judge
Superior Court County of Santa Barbara

———————————————————

Blum Collins & Ho, Steven A. Blum and Gary Ho, for Plaintiff, Cross-Defendant and Appellant.

The Law Office of Herb Fox, Herb Fox, for Defendants, Cross-Complainants and Respondents.